**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DIEGO FRAUSTO, )<br>   Plaintiff, )<br>       v. )<br> )<br>IC SYSTEM, INC., )<br>   Defendant. ) | 1:10-cv-1363<br><br>Judge Zagel<br><br>JURY DEMANDED |

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiffs respectfully request that, pursuant to both Fed.R.Civ.P. 23(b)(2) and 23(b)(3), this Court certify this case as a class action for the following class of similarly situated persons:

> All persons with Illinois cell phone numbers (a) who ICS called using any Minnesota-based dialer; (b) where ICS used a pre-recorded voice; (c) in an attempt to collect an alleged PayPal debt; (e) where the PayPal contract was identical to that of plaintiff in that it states that PayPal had consent to call, and not IC System; and (e) any such call was made by ICS at any time between August 1, 2009 and August 30, 2009. Excluded from the class are persons who, according to ICS' records, did *not* provide the phone number called to ICS or to PayPal, and did not otherwise attempt to revoke consent to receive such calls.

The timeframe is definitional, only; this case seeks damages for all calls to any person who falls within the class. Plaintiff further requests that the Court appoint plaintiff Diego Frausto as the class representative, and Burke Law Offices, LLC as class counsel.

In further support of this motion, plaintiff states:

1. The TCPA, 47 U.S.C. §227(b) prohibits calling persons on their cellular telephones using an "automatic telephone dialing system," and also prohibits use of "prerecorded" or "artificial voice" messages in such calls. 47 U.S.C. § 227(b)(1)(A)(iii); *Sengenberger v. Credit Control Services, Inc.*, 2010 WL 1791270, at *6 (N.D.Ill. May 5, 2010); reconsideration denied June 17, 2010.

2.      Defendant IC System, Inc. ("ICS") called plaintiff's cellular telephone thirty-eight times in attempts to collect an alleged debt.  ICS uses the same dialer to make these calls to each class member, and any violation of the TCPA for these class members will therefore be uniform among the class.

3.      All requirements of Rule 23 of the Federal Rules of Civil Procedure have been met.  Plaintiff files this motion to avoid the plaintiff from being "picked off" through a Rule 68 or individual settlement offer, as suggested by some court decisions.  *Greisz v. Household Bank*, 176 F.3d 1012 (7th Cir. 1999).

4.      Plaintiff specifically requests that the Court decide this motion before deciding plaintiff's motion for summary judgment.  Alternatively, plaintiff requests that the Court make a finding that by filing a motion for summary judgment before class certification, ICS has waived one-way intervention.  *Williams v. Lane*, 129 F.R.D. 636, 647-48 (N.D.Ill. 1990).  Plaintiff also requests that he be permitted discovery before setting a briefing schedule on this motion.

5.      <u>Numerosity</u>.  Numerosity is evident through ICS' use of the proscribed equipment, which is designed to contact a large number of individuals through automated, unmanned calling, and through the testimony of its dialer operations manager, Scott Ellison.  Exhibit A.  Joinder is therefore impracticable and satisfy numerosity for certification purposes.  Fed.R.Civ.P. 23(a)(1).

6.      <u>Common Questions Predominate</u>.  There exist common questions of law and fact, which predominate over any individual questions.  The class definition ensures that all of class members have identical claims; both factually and legally.  Fed.R.Civ.P. 23(a)(2) & 23(b)(3).

7. <u>Typicality</u>. Similarly, the plaintiff's claims are typical of the other class members. All of the claims are based upon a substantially identical set of facts and circumstances. Fed.R.Civ.P. 23(a)(3).

8. <u>Adequacy</u>. Plaintiff and counsel will fairly and adequately represent the class. Plaintiff's interests in this litigation are aligned with those of the class, and they have hired a lawyer experienced in class action and consumer litigation. <u>Exhibit B</u>. Fed.R.Civ.P. 23(a)(4).

9. <u>Defendant's Actions Applicable Generally</u>. The defendant has acted or failed to act on grounds generally applicable to each class member, and it is these generalized actions around which this case revolves. Class-wide Injunctive relief under the TCPA 47 U.S.C. §227(b)(3)(A), along with corresponding declaratory relief is therefore appropriate. Fed.R.Civ.P. 23(b)(2). All class members, who are the incorrect party, would benefit from the cessation of these annoying calls and defendant's opt-out policy.

10. <u>Superiority/Predominance</u>. It is desirable to have this case litigated as a class action because the class mechanism is superior to individual actions. Plaintiffs are not aware of any other cases alleging similar facts against these defendants; likely because the other members of the class are not aware that their rights have been violated. Further, a class action is necessary to determine that defendants' conduct is a violation of law and to redress the class members' statutory damages. Fed.R.Civ.P. 23(b)(3). Defendant called each class member using the same equipment, and defendant has identical defenses (or lack thereof) as to each class member.

11. Because the prerequisites of Fed.R.Civ.P. 23(b)(2) and 23(b)(3) are satisfied, this Court should certify the class. Plaintiffs request that the Court set a briefing schedule for this

motion sufficient to permit time for service of the complaint, discovery and the filing of a supplemental memorandum in support of this motion.

WHEREFORE, plaintiff respectfully requests that this Court certify this case as a class action as to the class defined herein, and appoint plaintiff Diego Frausto as class representative, and Burke Law Offices, LLC as class counsel.

                                      Respectfully submitted,

                                      /s/Alexander H. Burke

Alexander H. Burke
**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

# Exhibit A

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

----------------------------------

DIEGO FRAUSTO,

          Plaintiff,

vs.

IC SYSTEM, INC.,

          Defendant.

----------------------------------

    The Deposition of SCOTT ELLISON, taken pursuant to Notice of Taking Deposition, taken before Laurie A. Kjelden, a Notary Public in and for the County of Ramsey, State of Minnesota, on the 14th day of January, 2011, at 444 Highway 96, Vadnais Heights, Minnesota, commencing at approximately 1:30 p.m.

AFFILIATED COURT REPORTERS
2935 Old Highway 8
St. Paul, Minnesota 55113
(612) 338-4348

## Page 2

APPEARANCES:

ON BEHALF OF THE PLAINTIFF VIA TELEPHONE:

    ALEXANDER H. BURKE
    Burke Law Offices, LLC
    155 North Michigan Avenue
    Suite 9020
    Chicago, Illinois 60601

ON BEHALF OF THE DEFENDANT VIA TELEPHONE:
    PETER E. PEDERSON
    Hinshaw & Culbertson, LLP
    222 North LaSalle Street
    Suite 300
    Chicago, Illinois 60601

ALSO PRESENT:

    DONALD P. FITZGERALD III
    Vice President, Corporate Counsel
    444 Highway 96 East
    St. Paul, Minnesota 55127

\*\*\*

DEPOSITION OF SCOTT ELLISON

| Examination: | Page |
|---|---|
| Mr. Burke | 3 |
| Mr. Pederson | 17 |
| Mr. Burke | 22 |
| Exhibits: | Page |
| 1 Caption | 5 |

## Page 3

P R O C E E D I N G S
(Witness sworn)
SCOTT ELLISON
called as a witness, being first duly sworn,
was examined and testified as follows:
    \* \* \*
EXAMINATION
    \* \* \*
BY MR. BURKE:
Q.  Would you state your name for the record, please?
A.  Scott Ellison.
Q.  Mr. Ellison, my name is Alex Burke, and I represent the plaintiffs in a lawsuit called Frausto versus IC System, Incorporated.
    Have you ever given a deposition before?
A.  No, I have not.
Q.  Here's the deal, especially since we're on the telephone. I would request that you please make audible answers, both so I can hear them and so the court reporter can write them down, okay?
A.  Okay.
Q.  If you need a break for any reason, just let

## Page 4

us know, and we'll take a break. We'll just put the phone on hold, and you can go do whatever you want to do, okay?
A.  Okay.
Q.  I think this is going to be pretty quick today.
    Mr. Ellison, is there any reason why you can't give complete and accurate testimony today?
A.  No.
Q.  Are you on any medications or have any conditions that prevent you from doing so?
A.  No.
Q.  Great. Where are you employed, Mr. Ellison?
A.  IC System.
Q.  What is IC System?
A.  We're a collection agency.
Q.  Where is IC System located?
A.  In Vadnais Heights, Minnesota.
Q.  Is that near St. Paul?
A.  It's north of St. Paul, yes.
Q.  What is your position at IC System?
A.  The dialer operations manager.
Q.  What are your duties as dialer operations manager?

**Page 5**

1  A.  It's my duty to execute call strategies set
2  forth by our analytics and collection
3  operations people.
4  Q.  Mr. Ellison, are you aware that you're here
5  today as a corporate representative?
6  A.  Yes.
7  MR. BURKE:  Is there a copy of
8  the notice of deposition there?
9  THE COURT REPORTER:  Yes, there
10 is.
11 MR. BURKE:  Okay.  Would you
12 please mark that as Exhibit A and tender it
13 to the witness?
14 (Deposition Exhibit Letter A was
15 marked for identification.)
16 MR. PEDERSON:  Just for clarity,
17 can you identify the date of the deposition
18 notice that you're talking about, Alex,
19 because there have been a couple of
20 different notices, and they listed different
21 subjects?
22 MR. BURKE:  So the deposition
23 notice that I believe the witness has has a
24 certificate of service dated January 12th,
25 2010 on the second page.

**Page 6**

1  BY MR. BURKE:
2  Q.  Would that be correct, Mr. Ellison?
3  A.  I haven't seen the copy yet.
4  THE COURT REPORTER:  (Hands
5  exhibit.)
6  THE WITNESS:  That's correct.
7  BY MR. BURKE:
8  Q.  And for the record, if you turn to the first
9  page, we are not dealing with the topic in
10 the third box.
11 A.  Okay.
12 Q.  Would you please read topic one or the first
13 topic to yourself?
14 A.  (Reviews document.)
15 Q.  Are you competent to testify as to that
16 subject?
17 A.  Yes.
18 Q.  Have you been designated by IC System,
19 Incorporated to testify on that subject?
20 A.  Yes.
21 Q.  Same questions as to topic two.  Let's take
22 a minute.
23 A.  (Reviews document.)
24 Q.  Are you competent to testify on that topic?
25 A.  Yes.

**Page 7**

1  Q.  Have you been designated by IC System,
2  Incorporated to testify on its behalf as to
3  that topic?
4  A.  Yes.
5  Q.  Great.  How long have you worked at IC
6  System?
7  A.  18 years.
8  Q.  When you began 18 years ago, what did you do
9  at IC System?
10 A.  I started as a collector.
11 Q.  Over the 18 years, can you give me the
12 highlights of changes in positions, from
13 collector to --
14 A.  I went from a collector to a collection
15 supervisor, to a collection operations
16 manager, to my current position.
17 Q.  When did you go from collection operations
18 manager to dialer operations manager?
19 A.  Approximately four years ago.  I believe it
20 was January of '07.
21 Q.  When you say "dialer," what do you mean?
22 A.  Our automated dialer systems.
23 Q.  How many dialers does IC System have?
24 A.  Five.
25 Q.  Where are they located?

**Page 8**

1  A.  They're all in the St. Paul office.
2  Q.  If IC System wants to call a debtor using
3  its dialer, how does it do so?
4  A.  The list is generated off our host system.
5  The phone number would have to be attached
6  to an account that's been placed with IC
7  System, then downloaded to our dialer.
8  Q.  And you say a list.  Would you be referring
9  to, for example, a campaign to collect a
10 list of certain debts?
11 A.  Yes.
12 Q.  So would it be accurate to say that someone
13 at IC System either -- someone at IC System
14 decides that a dialling campaign should
15 happen, so they query the database to put
16 together a list of accounts that they went
17 to collect?
18 A.  Yes.  That would be correct.
19 Q.  Then those accounts are sent to the dialer,
20 and the dialer dials the account; is that
21 right?
22 A.  Yes.
23 Q.  How does a dialer decide which accounts to
24 call when?
25 A.  Well, the dialer can be -- well, you can

9

1  change or you can select a sort on the
2  dialer to call it in whichever order you
3  wish to call those accounts in.
4  Q. Okay. Does the dialer also sometimes decide
5     when to make the phone calls?
6  A. If we do not specify a certain order, then
7     yes, it will dial.
8  Q. So it would decide what order to dial the
9     phone numbers in?
10 A. Yes.
11 Q. Do your dialers have capability of
12    intelligently deciding what time of day to
13    call particular dialers -- debtors?
14 A. Not necessarily what time of day, but it
15    does not allow to call phone numbers that
16    are not within our legal calling times.
17 Q. So my question is -- you know, some people
18    work during the day, some people don't. I
19    would guess that some phone calls, for
20    example, at dinner time are more effective
21    at getting someone to answer than those that
22    are called in the morning on a weekday.
23        Does the dialer make any
24    decisions as to what time of day to call
25    people?

10

1  A. No, it does not.
2  Q. As to the plaintiff's account, do you know
3     whether the campaigns were the type of
4     campaigns where the dialer decided what
5     order to call or whether a human being
6     decided what order to call?
7        MR. PEDERSON: Objection to the
8     question, compound. You can answer, Scott.
9        THE WITNESS: Can you repeat
10    that, please?
11    BY MR. BURKE:
12 Q. I'm just trying to figure out as to the
13    plaintiff in this case, Diego Frausto,
14    whether you know whether the calls to Diego
15    were the type of calls where the dialer
16    decided when to call or when -- or the type
17    of calls where the -- where some person
18    decided what order to call him in?
19 A. No. I do not know how it was set for that
20    day.
21 Q. Would it be accurate to say that sometimes
22    the dialer leaves messages for debtors?
23 A. Yes.
24 Q. And those messages that the dialer leaves,
25    are those messages that were recorded ahead

11

1     of time?
2  A. Yes.
3  Q. So when a person picks up and the dialer
4     decides to leave a message, it plays this
5     message -- the same message to each person
6     who picks up; is that right?
7  A. Yes.
8  Q. Does it ever happen at IC System that a
9     debtor answers and IC System is able to have
10    a live operator on its end of the call when
11    the dialer calls?
12 A. Yes.
13 Q. Can you give me some idea of maybe a
14    percentage of calls when there's an operator
15    available to speak to the recipient of a
16    call?
17 A. I would say 85 to 90 percent.
18 Q. So if there's nobody available at IC System,
19    then it just leaves a prerecorded message;
20    is that right?
21 A. Well, we're actually talking about two
22    different types of dialer campaigns.
23 Q. Okay. Can you explain the two different
24    kinds, please?
25 A. The campaign where we have agents attached

12

1     to -- available to take the calls on a
2     connect, those calls do not leave any
3     automated messages. And then if we choose
4     to run a campaign or job with automated
5     messages, that typically will be all we run,
6     are calls to be -- to leave messages.
7  Q. Does it ever happen that IC System uses its
8     dialer to call someone, the person answers,
9     and there's an agent -- an IC System person
10    available and those people speak, and then
11    after they speak a prerecorded message is
12    played?
13 A. No.
14 Q. When the dialer is making calls, who is
15    dialing the phone numbers? Is it the dialer
16    or a human being or something else?
17 A. It's the dialer.
18 Q. Does IC System intend to call people using
19    its dialer?
20 A. Yes.
21 Q. Does IC System intend to call people using
22    its prerecorded messages?
23 A. Yes.
24 Q. Are there any instances that you can think
25    of where IC System called someone using its

13

1  dialer but didn't intend to do so?
2      MR. PEDERSON: Objection, calls
3  for speculation, but the witness can answer
4  if he knows.
5      THE WITNESS: No. No. I don't
6  believe so.
7  BY MR. BURKE:
8  Q. Did IC System intend to call Diego Frausto
9     using its dialer?
10 A. Yes.
11 Q. We've been talking about how the dialer
12    works and how the prerecorded messages work.
13    Thinking back over the last three years, in
14    your experience as dialer operations
15    manager, would you say that the dialers have
16    substantially changed such that the answers
17    to these questions might have been
18    different?
19     MR. PEDERSON: Objection to the
20  form of the question. It's vague. The
21  witness can answer to the extent he
22  understands the question.
23     THE WITNESS: No. I don't
24  believe so.
25 BY MR. BURKE:

14

1  Q. No, they haven't changed?
2  A. No.
3      MR. PEDERSON: And a related
4  objection is that the witness testified that
5  there are five dialers, and all of these
6  questions have been stated in terms of the
7  dialer.
8      MR. BURKE: Okay. I'll clarify
9  that.
10 BY MR. BURKE:
11 Q. I have been asking about the dialers. Do
12    all the dialers work substantially the same?
13 A. Yes.
14 Q. Okay. So the answers to my questions
15    regarding how you load people's information
16    into the dialers, would those answers be the
17    same for all five dialers?
18 A. Yes.
19 Q. And the intent questions as well, would
20    those be the same for all five dialers?
21 A. Yes.
22 Q. As part of the dialing campaign, will the
23    dialer ever call any particular number more
24    than once?
25 A. Within a dialling campaign?

15

1  Q. Right.
2      MR. PEDERSON: I'm going to
3  object to the form of the question as vague
4  and lacking foundation, because there's no
5  definition of what a campaign is. Subject
6  to that, the witness can answer.
7      THE WITNESS: Yes.
8  BY MR. BURKE:
9  Q. Can you explain to me what a dialing
10    campaign is, please?
11 A. A dialing campaign is simply a -- what we
12    call a dialer job or a list of accounts that
13    we actually dial on the auto dialer.
14 Q. So would it be accurate to say, then, that
15    sometimes as part of the campaign, the
16    dialer would call a particular number twice?
17 A. If we instruct it to do so.
18 Q. Would it ever call a particular number twice
19    in a campaign where it's the dialer that's
20    deciding who to call when?
21 A. Yes.
22 Q. Is there a certain term that's given to the
23    type of campaign where the dialer is
24    deciding who to call when?
25 A. No, there is not.

16

1  Q. So is it just like a programming designation
2     when the campaign is initiated?
3  A. Yes.
4  Q. Mr. Ellison, is there anyone in the room
5     other than you and the court reporter?
6  A. Yes, there is.
7  Q. Who is in the room?
8  A. Don Fitzgerald.
9  Q. Who is Don Fitzgerald?
10 A. He is IC System's attorney.
11 Q. Have you been communicating with
12    Mr. Fitzgerald at all during this
13    deposition?
14 A. No.
15     MR. PEDERSON: Mr. Fitzgerald is
16  the corporate representative of the
17  defendant.
18     MR. BURKE: You mean as like a
19  corporate representative observer?
20     MR. PEDERSON: Right.
21     MR. BURKE: That's all I have for
22  today on these subjects.
23     MR. PEDERSON: I have a little
24  bit of follow-up.
25

**Page 17**

```
                    * * *
                 EXAMINATION
                    * * *
     BY MR. PEDERSON:
  Q. Mr. Ellison, earlier you testified that in
     some campaigns the dialer will decide the
     order in which the phone numbers included in
     the campaign are dialed; is that correct?
  A. Yes.
  Q. And in other campaigns an employee of IC
     will set the -- will control the order in
     which the phone numbers included in the
     campaign are called by the dialer; is that
     correct?
  A. That's correct.
  Q. How often does an IC employee control the
     order in which the numbers included in the
     campaign are called?
  A. It's typical for us to do that. A very high
     percentage of the campaigns do have a -- the
     sort set to a certain value that operations
     may want.
  Q. In the case of a campaign where the dialer
     is selecting the order in which the numbers
     are called, is it true that a human being
```

**Page 18**

```
     employed by IC System will still be
     responsible for deciding what numbers are
     included in that campaign in the first
     place?
  A. Yes. This is within a campaign that I'm
     referring to, as far as how the numbers are
     dialed or the order in which the accounts
     are dialed.
  Q. Does a human being employed by IC set the
     criteria for selecting the numbers that are
     included in a dialing campaign in the case
     of all of the company's dialing campaigns?
  A. Yes.
  Q. How long does a dialing campaign typically
     last?
  A. We don't really have a typical time frame.
     We have some very small campaigns, and we
     have some very large campaigns. Some will
     last a half hour. We have others that will
     last the entire workday.
  Q. Will they ever last longer than a day?
  A. No, they cannot. We rebuild our list each
     night.
  Q. When IC System uses its dialing technology
     to call people, does it intend to comply
```

**Page 19**

```
     with the Telephone Consumer Protection Act?
  A. Yes.
         MR. PEDERSON: I don't have
     anything further.
         MR. BURKE: I just have a couple
     on redirect.
                    * * *
              REDIRECT EXAMINATION
                    * * *
     BY MR. BURKE:
  Q. If the dialer calls as part of the campaign
     where the -- where a person decides what
     order the calls will be in and nobody
     answers the phone call, will the dialer try
     again later?
  A. The dialer has the ability to do that, but
     it would depend on how the settings on that
     campaign are set up.
  Q. Typically how is that setting set for
     campaigns?
  A. Typically we would not call that back within
     that campaign.
         MR. BURKE: I think that's all.
         MR. PEDERSON: Well, we will
     reserve signature.
```

**Page 20**

```
         MR. BURKE: So we're off the
     record.
```

```
                              21
  1            SIGNATURE PAGE
  2
  3     CASE:  DIEGO FRAUSTO vs. IC SYSTEM, INC.,
  4     DATE OF DEPOSITION:  January 14, 2011
  5           I, SCOTT ELLISON, deponent,
        certify that I have read the foregoing
  6     transcript of my testimony and have made the
        following corrections and/or changes and the
  7     reason why:
  8     PAGE:  LINE:  CHANGE:
  9
 10
 11
 12
 13
 14
 15
 16
 17     _____
        SCOTT ELLISON
 18
 19     _____   _____
         AFFIX SEAL          NOTARY PUBLIC
 20
              Dated this _____ day
 21     of_____,20_____.
 22
        Please return to:
 23
        Laurie A. Kjelden
 24     5171 St. Albans Street North
        Shoreview, Minnesota 55126
 25
```

```
                              22
  1     STATE OF MINNESOTA )
  2
        COUNTY OF RAMSEY   )
  3
  4           Be it known that I took the
        deposition of SCOTT ELLISON on January 14,
  5     2011;
  6           That I was then and there a
        notary public in and for the County of
  7     Ramsey, State of Minnesota, and that by
        virtue thereof I was duly authorized to
  8     administer an oath;
  9           That the witness before
        testifying was by me first duly sworn to
 10     testify the whole truth and nothing but the
        truth relative to said cause;
 11
              That the testimony of said
 12     witness was recorded in stenotype by myself
        and transcribed into typewriting under my
 13     direction, and that the deposition is a true
        record of the testimony given by the witness
 14     to the best of my ability;
 15           That I am not related to any
        of the parties hereto nor interested in the
 16     outcome of the action;
 17           That the reading and signing
        by the witness and Notice of Filing were not
 18     waived;
 19
              Witness my hand and seal this
 20     20th day of January, 2011.
 21
 22
                  LAURIE A. KJELDEN
 23               COURT REPORTER
 24
 25
```

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIEGO FRAUSTO, <br>     Plaintiff, <br><br> v. <br><br> IC SYSTEM, INC., <br>     Defendant. | )<br>)   1:10-cv-1363<br>)<br>)   Judge Zagel<br>)<br>)<br>)<br>)<br>)   JURY DEMANDED<br>) |

## DECLARATION OF ALEXANDER H. BURKE

I am Alexander H. Burke, manager of Burke Law Offices, LLC.

In September 2008, I opened Burke Law Offices, LLC. This firm concentrates on consumer class action and consumer work on the plaintiff side. Since the firm began, it has prosecuted cases for consumers under the Telephone Consumer Protection Act, Fair Debt Collection Practices Act, Fair Credit Reporting Act, Equal Credit Opportunity Act, Electronic Funds Transfer Act, Illinois Consumer Fraud Act, Truth in Lending Act and the Fair Labor Standards Act, among others. The firm also occasionally accepts mortgage foreclosure defense or credit card defense case. Except for debt collection defense cases, the firm works almost exclusively on a contingency basis.

My legal career began at Edelman, Combs, Latturner & Goodwin, LLC, in Chicago, Illinois, where I spent nearly three years litigating exclusively consumer cases. I estimate that approximately sixty-five percent of those cases were class actions. In 2007, I joined the Law Offices of Keith J. Keogh, Ltd., another consumer rights law firm, where my practice was again limited almost exclusively to consumer class action.

I make substantial efforts to remain current on the law, including class action issues. I attended the National Consumer Law Center Consumer Rights Litigation Conference in 2006, 2007, 2008, 2009 and 2010, and was an active participant in the Consumer Class Action Intensive Symposium at each of those conferences. In October 2009, I spoke on a panel of consumer class action attorneys welcoming newcomers to the conference. In addition to regularly attending Chicago Bar Association meetings and events, I am the vice-chair of the Chicago Bar Association's consumer protection section, and in November 2009, I moderated a panel of judges and attorneys discussing recent events and decisions concerning arbitration of consumer claims and class action bans in consumer contracts. In November, 2010, I spoke at

the National Association of Elder Law Attorneys national conference in San Diego, California, regarding consumer protection issues.

Some notable cases and class actions that I have worked on include:

*Powell v. West Asset Management, Inc.*, 1:10-cv-7852 (N.D.Ill. March 24, 2011) (striking TCPA defendant's "mitigation of damages" affirmative defense in individual case); *Fike v. The Bureaus, Inc.*, 1:09-cv-2558 (N.D.Ill.) ($800,000 settlement in TCPA autodialer class action); *Greene v. DirecTV, Inc.*, 2010 WL 1506730 (N.D.Ill. April 14, 2010) (motion to dismiss denied as to class TCPA and FCRA claims); *Donnelly v. NCO Financial Systems, Inc.*, 263 F.R.D. 500 (N.D.Ill. Dec. 16, 2009) Fed.R.Civ.P. 72 objections overruled in toto, --- F.Supp.2d ----, 2010 WL 308975 (N.D.Ill. Jan 13, 2010) (novel class action and TCPA discovery issues decided favorably to class); *Cicilline v. Jewel Food Stores, Inc.*, 542 F.Supp.2d 831 (N.D.Ill. 2008) (FCRA class certification granted); 542 F.Supp.2d 842 (N.D.Ill. 2008) (plaintiffs' motion for judgment on pleadings granted); *Harris v. Best Buy Co.*, 07 C 2559, 2008 U.S. Dist. LEXIS 22166 (N.D.Ill. March 20, 2008) (Class certification granted); *Matthews v. United Retail, Inc.*, 248 F.R.D. 210 (N.D.Ill. 2008) (FCRA class certification granted); *Redmon v. Uncle Julio's, Inc.*, 249 F.R.D. 290 (N.D.Ill. 2008) (FCRA class certification granted); *Harris v. Circuit City Stores, Inc.*, 2008 U.S. Dist. LEXIS 12596, 2008 WL 400862 (N.D. Ill. Feb. 7,2008) (FCRA class certification granted); aff'd upon objection (Mar. 28, 2008); *Harris v. Wal-Mart Stores, Inc.*, 2007 U.S. Dist. LEXIS 76012 (N.D. Ill. Oct. 10, 2007) (motion to dismiss in putative class action denied); *Barnes v. FleetBoston Fin. Corp.*, C.A. No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D.Mass. Aug. 22, 2006) (appeal bond required for potentially frivolous objection to large class action settlement, and resulting in a $12.5 million settlement for Massachusetts consumers); *Longo v. Law Offices of Gerald E. Moore & Assocs.*, P.C., 04 C 5759, 2006 U.S. Dist. LEXIS 19624 (N.D.Ill. March 30, 2006) (class certification granted); *Nichols v. Northland Groups, Inc.*, case nos. 05 C 2701, 05 C 5523, 06 C 43, 2006 U.S. Dist. LEXIS 15037 (N.D.Ill. March 31, 2006) (class certification granted for concurrent classes against same defendant for ongoing violations); *Lucas v. GC Services, L.P.*, case No. 2:03 cv 498, 226 F.R.D. 328 (N.D.Ind. 2004) (compelling discovery), 226 F.R.D. 337 (N.D.Ind. 2005) (granting class certification); *Murry v. America's Mortg. Banc, Inc.*, case nos. 03 C 5811, 03 C 6186, 2005 WL 1323364 (N.D. Ill. May 5, 2006) (Report and Recommendation granting class certification), aff'd, 2006 WL 1647531 (June 5, 2006); *Rawson v. Crediqy Receivables, Inc.*, case no. 05 C 6032, 2006 U.S. Dist. LEXIS 6450 (N.D. Ill. Feb. 16, 2006) (denying motion to dismiss in class case against debt collector for suing on time-barred debts).

I graduated from Colgate University in 1997 (B.A. International Relations), and from Loyola University Chicago School of Law in 2003 (J.D.). During law school I served as an extern to the Honorable Robert W. Gettleman of the District Court for the Northern District of Illinois and as a law clerk for the Honorable Nancy Jo Arnold, Chancery Division, Circuit Court of Cook County. I also served as an extern for the United States Attorney for the Northern District of Illinois and was a research assistant to adjunct professor Honorable Michael J. Howlett, Jr.

I was the Feature Articles Editor of the Loyola Consumer Law Review and Executive Editor of the International Law Forum. My published work includes International Harvesting on

the Internet: A Consumer's Perspective on 2001 Proposed Legislation Restricting the Use of Cookies and Information Sharing, 14 Loy. Consumer L. Rev. 125 (2002).

I became licensed to practice law in the State of Illinois in 2003 and the State of Wisconsin in March 2011, and am a member of the bar of the United States Court of Appeals for the Seventh and First Circuits, as well as the Northern District of Illinois, Central District of Illinois, Southern District of Illinois, Eastern District of Wisconsin, Northern District of Indiana and Southern District of Indiana. In 2009-10, I was the vice chair of the Consumer Protection section of the Chicago Bar Association, and am the chair of that group for the 2010-2011 year. I am also a member of the Illinois State Bar Association, the Seventh Circuit Bar Association and the American Bar Association, as well as the National Association of Consumer Advocates.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Chicago, Illinois
March 31, 2011

Alexander H. Burke