# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DIEGO FRAUSTO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:10-cv-1363** |
| | ) | |
| **IC SYSTEM, INC.,** | ) | **Judge Zagel** |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST DISCOVERY REQUESTS

Defendant, IC SYSTEM, INC. ("IC"), submits these Responses to Plaintiff's First Discovery Requests:

## GENERAL OBJECTIONS

1.      Defendant objects to the First Discovery Requests (the "Requests"), including the definitions and instructions contained therein, to the extent that they purport to impose obligations greater than those imposed by the Federal Rules of Civil Procedure, the Local Rules, and binding case law.

2.      Defendant objects to the Requests to the extent they seek information that is not reasonably calculated to lead to the discovery of admissible evidence.

3.      Defendant objects to the Requests to the extent they seek information that is not in defendant's possession or is within Plaintiff's possession.

4.      Defendant objects to the Requests to the extent that they, or the definitions or instructions applicable to the Requests, contain vague, ambiguous, or undefined terms.

5.      Defendant objects to the Requests to the extent they call for information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege. Defendant will not disclose information protected by any such privileges.

Any disclosure of such information should be deemed inadvertent and not a waiver of any of the protections listed above.

6.      Defendant objects to the Requests to the extent they seek trade secrets, commercial or proprietary business information, or any other confidential information. Defendant will produce such information only pursuant to the parties' confidentiality agreement.

7.      Defendant reserves the right to object on any ground to the use of any of his responses to the Requests or the subject matter of the Requests in any subsequent proceeding, and at the trial of this action.

8.      Defendant reserves the right at any time to revise, correct, supplement, amend, or clarify any responses to the Requests.

Subject to the General Objections above, all of which are incorporated by this reference into each response set forth below, whether or not they are specifically stated.

## RESPONSES TO SPECIFIC REQUESTS

## REQUESTS FOR ADMISSION

1.      Defendant used an "automatic telephone dialing system" as that term is defined in the FCC's January 4, 2008, order, to call or attempt to call plaintiff more than thirty-seven times.

**RESPONSE:**    IC admits that it called the plaintiff using a telephone dialing system that meets the definition of "automatic telephone dialing system" ("ATDS") set forth in the FCC's Declaratory Ruling, No. FCC 07-232. IC admits that it called plaintiff using its telephone dialing system a total of 38 times. IC denies the remaining allegations contained in ¶ 1 and denies that its telephone dialing system meets the definition of ATDS that is set forth in 47 U.S.C. § 227(a)(1).

2.      Defendant used an "automatic telephone dialing system" as that term is defined in the FCC's January 4, 2008, TCPA order, to call or attempt to call plaintiff more than fifty-five times.

**RESPONSE:**    IC denies the allegations contained in ¶ 2.

2

## INTERROGATORIES

1.    Identify all communications and attempted communications, including calls, you or your Dialer made with plaintiff and telephone number ██████-7867. Include the method of contact (e.g. Dialer or manual dial), where the dialer was physically located, what kind of dialer was used, whether an automated or "live" voice message was left, all persons involved, the date and time of each call and the text of the message that was left, if any.

**ANSWER:**    IC objects that this request is overly broad, unduly burdensome, and irrelevant because it seeks information about communications that IC did not make with its telephone dialing system ("TDS"). Such communications have no bearing on the claim plaintiff has alleged under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

Subject to the above objections, pursuant to Federal Rule 33(d), IC refers plaintiff to the collection screens (which have already been produced) which document all communications that took place between IC and plaintiff. IC will also produce a key for the abbreviations used in the screens and a report showing the date and time of the 38 calls IC made to plaintiff.

IC has four Avaya PDS dialers, all of which are Version 12.0. IC has one Noble dialer, Version 2008.3.1. IC called plaintiff using an Avaya dialer in St. Paul.

The following collectors were involved in IC's efforts to collect plaintiff's debt: Matthew McHale (shown in the collection notes as "MMC") and Denise Bunker (shown in the notes as "DNB").

2.    If you contend that any call made or attempted by you was not made with an automatic telephone dialing system as that term is defined in the FCC's January 4, 2008, order please explain why. Include identification of all documents that support or refute that contention, including but not limited to: documents concerning your dialer, including manuals, advertisements, emails concerning its use and maintenance, statistics showing usage and efficacy.

**ANSWER:**    IC has not located a record of making a call to plaintiff by manually dialing his number.

3

3.     If you contend that any message left by you was not a "an artificial or prerecorded voice" as referred to in 47 U.S.C. §227(b)(1)(A), please explain why, and identify all facts, documents, witnesses and legal authority you know of that support or refute this position.

**ANSWER:**     The messages IC left for plaintiff were generated with an artificial or prerecorded voice.

4.     Identify your defenses in this case, and identify all facts, documents, witnesses and legal authority you know of that support or refute this position.

**ANSWER:**     IC objects to this request to the extent it seeks information protected by the attorney-client privilege and work product doctrine, such as the defense strategy of IC's counsel. IC objects to the request for legal authorities on the ground that IC has not completed its investigation into the facts or its analysis of the applicable law. Subject to these objections, IC answers as follows:

(a)     IC did not commit a *Foti* violation by leaving plaintiff a message which did not disclose IC's identity. Any message that IC left for plaintiff disclosed IC's identity in accordance with 15 U.S.C. § 1692d(6). IC's policy is to only leave messages that disclose IC's identity. Due to these facts, plaintiff cannot establish the elements of a § 1692d(6) violation, and IC is shielded from liability by the bona fide error defense, 15 U.S.C. § 1692k.

(b)     A call made to a cell phone using an automatic telephone dialing system or prerecorded message ("an auto-dialed call") complies with the Telephone Consumer Protection Act ("TCPA") if it is made with the called party's consent. 47 U.S.C. § 227(b)(1). Plaintiff consented to receiving calls that IC made to his cell phone using an automatic telephone dialing system or prerecorded message for the following reasons:

*First,* when a person gives his cell phone number to a creditor in connection with a debt, he gives consent for a debt collector seeking payment of the debt to make auto-dialed calls to that number. Federal Communications Commission Declaratory Ruling, FCC 07-232, ¶ 9. IC

6592402v1  0910619  71482

called plaintiff seeking to collect a debt he owed to PayPal. Plaintiff had voluntarily given PayPal the phone number that IC called. Under the FCC ruling, plaintiff consented to receiving auto-dialed calls from IC in its efforts to collect his PayPal debt.

*Second,* plaintiff's PayPal User Agreement expressly reflects that he gave consent to be contacted on his cell phone in connection with his PayPal account. It provides:

> By providing PayPal a telephone number (including a wireless/cellular telephone), you consent to receiving autodialed and prerecorded message calls from PayPal at that number. (Agreement § 1.10).

This language reflects that plaintiff consented to receiving on the phone number he provided autodialed calls from or on behalf of PayPal, including any calls made by IC in its efforts to collect the PayPal debt.

*Third*, the PayPal Privacy Policy that is incorporated into the PayPal User Agreement states that PayPal "may share your [plaintiff's] personal information with:"

> Service providers under contract who help with parts of our business operations; (fraud prevention, bill collection, marketing, technology services). Our contracts dictate that these service providers only use your information in connection with the services they perform for us and not for their own benefits.

The Privacy Policy further confirms that plaintiff consented to receiving autodialed calls on behalf of PayPal on the phone number he provided.

(c)     In the event that the portion of the FCC Declaratory Ruling No. 07-232 which brings predictive dialers within the definition of an ATDS is invalidated or withdrawn, IC will argue that its phone system does not amount to an ATDS under the statutory language set forth in 27 U.S.C. § 227(a)(1).

5.     Identify by bates number all document you have, have access to or have reviewed, that mentions or suggests that prerecorded voice messages sometimes cut off on debtors' voice mail. A complete search for such documents would include a search of:

6592402v1 0910619 71482

a.     ACA International and other trade publications to which you subscribe or have internet access;

b.     Formal and informal complaints;

c.     Internal communications, such as emails or memoranda;

d.     Suggestions from debtors;

e.     Governmental and regulatory inquiries.

**ANSWER:**     IC objects to this request to the extent it seeks information protected by the attorney-client privilege and work product doctrine. Subject to this objection, IC states it is not aware of documents related to the possibility that a prerecorded message will not be completely recorded by a debtor's voicemail or answering machine.

## DOCUMENT REQUESTS

1.     All documents that mention or pertain to the plaintiff, Diego Frausto, phone number ███████-7867, or symbol, number or other designation that is associated with plaintiff.

**RESPONSE:**     IC objects to this request to the extent it seeks information protected by the attorney-client privilege and work product doctrine. Subject to that objection, IC will produce documents responsive to this request.

2.     A transcript and the actual recording that was used for any communication directed to plaintiff.

**RESPONSE:**     A recording of the message will be produced.

3.     All documents referred to in the response to any interrogatory.

**RESPONSE:**     IC objects to this request to the extent it seeks information protected by the attorney-client privilege and work product doctrine. Subject to that objection, IC will produce documents responsive to this request.

6592402v1  0910619  71482

4.  All documents relating to any defense you have raised or intend to raise in this case.

**RESPONSE:**  IC objects to this request to the extent it seeks information protected by the attorney-client privilege and work product doctrine. Subject to that objection, IC will produce documents responsive to this request.

5.  If you contend that any call made or attempted by you was not made with an automatic telephone dialing system as that term is defined in the FCC's January 4, 2008, order please produce all documents that support or refute this contention.

**RESPONSE:**  Not applicable.

6.  If you contend that any message left by you was not a "an artificial or prerecorded voice" as referred to in 47 U.S.C. §227(b)(1)(A), please produce all documents that support or refute such contention.

**RESPONSE:**  Not applicable.

7.  All documents that mention or suggest that prerecorded voice messages sometimes cut off on debtors' voice mail. A complete search for such documents would include a search of:

  a.  ACA International and other trade publications to which you subscribe or have internet access;

  b.  Formal and informal complaints;

  c.  Internal communications, such as emails or memoranda;

  d.  Suggestions from debtors;

  e.  Governmental and regulatory inquiries.

**RESPONSE:**  IC does not have documents related to whether a prerecorded voice message may not be recorded completely on a debtor's answering machine or voicemail.

8.  All documents that support or refute any defense you have raised or intend to raise in this case.

7

**RESPONSE:** IC objects to this request to the extent it seeks information protected by the attorney-client privilege and work product doctrine. Subject to that objection, IC will produce documents relating to its defenses.

9. All phone records or other documents that display any communication or attempted communication between you and plaintiff.

**RESPONSE:** IC will produce documents responsive to this request.

David M. Schultz
Peter E. Pederson                                        IC SYSTEM, INC.
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street                                   By:____/s/ Peter E. Pederson_____
Suite 300                                                      One of its Attorneys
Chicago, Illinois 60601
(312) 704-3000
**Fax:** (312) 704-3001
dschultz@hinshawlaw.com
ppederson@hinshawlaw.com

## CERTIFICATE OF SERVICE

I the undersigned attorney certify that, on September 28, 2010, I served Defendant's Responses to Plaintiff's First Discovery Requests by emailing a copy to counsel of record identified below.

/s/ Peter E. Pederson_____

## SERVICE LIST

Alex Burke, Esq.
Burke Law Offices, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

6592402v1 0910619 71482

## **VERIFICATION**

I certify under penalty of perjury under the laws of the United States of America that the answers to the foregoing interrogatories are true and correct, to the best of my knowledge and belief.

_____
Sue Johnson

_____
Date

6592402v1 0910619 71482

# Exhibit B

Frausto v IC

| Invoice Date | Customer Name | From Number | From City | From State | To Number | To City | To State | Call Date | Call Time | Billable Duration |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/8/2009 | 10:11:43 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/8/2009 | 13:01:19 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/11/2009 | 17:40:56 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/11/2009 | 20:03:46 | 0.2 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/13/2009 | 20:02:25 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/13/2009 | 20:53:13 | 0.2 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/14/2009 | 12:26:09 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/14/2009 | 15:32:24 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/16/2009 | 9:47:46 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/17/2009 | 19:10:49 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/18/2009 | 17:49:57 | 0.1 |
| 8/31/2009 | IC System, Inc. | (603) 589-7207 | NASHUA | NH | 7867 | ARLIGTNHTS | IL | 8/19/2009 | 12:14:39 | 1.6 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/20/2009 | 17:57:14 | 0.2 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/21/2009 | 17:07:27 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/22/2009 | 10:49:21 | 0.1 |
| 8/31/2009 | IC System, Inc. | (603) 589-7207 | NASHUA | NH | 7867 | ARLIGTNHTS | IL | 8/22/2009 | 13:53:56 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/23/2009 | 8:52:07 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/24/2009 | 15:15:14 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/24/2009 | 20:05:46 | 0.2 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/25/2009 | 20:25:15 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/26/2009 | 17:39:48 | 0.2 |
| 8/31/2009 | IC System, Inc. | (603) 589-7207 | NASHUA | NH | 7867 | ARLIGTNHTS | IL | 8/27/2009 | 15:04:36 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/27/2009 | 17:24:18 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/27/2009 | 19:33:49 | 0.2 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/27/2009 | 20:37:03 | 0.4 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/28/2009 | 12:48:31 | 0.2 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/28/2009 | 16:30:10 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/29/2009 | 8:11:09 | 0.2 |
| 8/31/2009 | IC System, Inc. | (603) 589-7207 | NASHUA | NH | 7867 | ARLIGTNHTS | IL | 8/29/2009 | 13:15:25 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/30/2009 | 15:32:24 | 0.1 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/31/2009 | 13:40:49 | 0.2 |
| 8/31/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 8/31/2009 | 17:02:53 | 0.2 |
| 9/30/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 9/1/2009 | 19:26:57 | 0.2 |
| 9/30/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 9/1/2009 | 20:29:31 | 0.1 |
| 9/30/2009 | IC System, Inc. | (603) 589-7207 | NASHUA | NH | 7867 | ARLIGTNHTS | IL | 9/2/2009 | 15:47:07 | 0.1 |
| 9/30/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | 7867 | ARLIGTNHTS | IL | 9/2/2009 | 18:18:34 | 0.2 |

Frausto v IC

| 9/30/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | █████ 7867 | ARLIGTNHTS | IL | 9/2/2009 | 20:01:43 | 0.2 |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/30/2009 | IC System, Inc. | (651) 204-1349 | ST PAUL | MN | █████ 7867 | ARLIGTNHTS | IL | 9/2/2009 | 20:45:54 | 0.2 |
| | | | | | | | | | | |
| | | | | | | | | | | |

IC_000004

# Exhibit C



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------

DIEGO FRAUSTO,

                    Plaintiff,

        vs.

IC SYSTEM, INC.,

                    Defendant.

-----------------------------------

        The Deposition of SCOTT ELLISON,
taken pursuant to Notice of Taking
Deposition, taken before Laurie A. Kjelden,
a Notary Public in and for the County of
Ramsey, State of Minnesota, on the 14th day
of January, 2011, at 444 Highway 96, Vadnais
Heights, Minnesota, commencing at
approximately 1:30 p.m.

            AFFILIATED COURT REPORTERS
                2935 Old Highway 8
            St. Paul, Minnesota 55113
                (612) 338-4348

**Page 2**

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFF VIA TELEPHONE:
4      ALEXANDER H. BURKE
       Burke Law Offices, LLC
       155 North Michigan Avenue
5      Suite 9020
       Chicago, Illinois 60601
6
7  ON BEHALF OF THE DEFENDANT VIA TELEPHONE:
8      PETER E. PEDERSON
       Hinshaw & Culbertson, LLP
9      222 North LaSalle Street
       Suite 300
10     Chicago, Illinois 60601
11
12  ALSO PRESENT:
13     DONALD P. FITZGERALD III
       Vice President, Corporate Counsel
14     444 Highway 96 East
       St. Paul, Minnesota 55127
15              ***
16
17  DEPOSITION OF SCOTT ELLISON
18
19  Examination:              Page
    Mr. Burke                  3
20  Mr. Pederson              17
    Mr. Burke                 22
21
22  Exhibits:                 Page
23  1 Caption                  5
24
25

**Page 3**

1              P R O C E E D I N G S
2   (Witness sworn)
3              SCOTT ELLISON
4   called as a witness, being first duly sworn,
5   was examined and testified as follows:
6              *  *  *
7              EXAMINATION
8              *  *  *
9   BY MR. BURKE:
10  Q.  Would you state your name for the record,
11      please?
12  A.  Scott Ellison.
13  Q.  Mr. Ellison, my name is Alex Burke, and I
14      represent the plaintiffs in a lawsuit called
15      Frausto versus IC System, Incorporated.
16          Have you ever given a deposition
17      before?
18  A.  No, I have not.
19  Q.  Here's the deal, especially since we're on
20      the telephone.  I would request that you
21      please make audible answers, both so I can
22      hear them and so the court reporter can
23      write them down, okay?
24  A.  Okay.
25  Q.  If you need a break for any reason, just let

**Page 4**

1   us know, and we'll take a break.  We'll just
2   put the phone on hold, and you can go do
3   whatever you want to do, okay?
4   A.  Okay.
5   Q.  I think this is going to be pretty quick
6       today.
7           Mr. Ellison, is there any reason
8       why you can't give complete and accurate
9       testimony today?
10  A.  No.
11  Q.  Are you on any medications or have any
12      conditions that prevent you from doing so?
13  A.  No.
14  Q.  Great.  Where are you employed, Mr. Ellison?
15  A.  IC System.
16  Q.  What is IC System?
17  A.  We're a collection agency.
18  Q.  Where is IC System located?
19  A.  In Vadnais Heights, Minnesota.
20  Q.  Is that near St. Paul?
21  A.  It's north of St. Paul, yes.
22  Q.  What is your position at IC System?
23  A.  The dialer operations manager.
24  Q.  What are your duties as dialer operations
25      manager?

Suggested line for Running Header

---

**5**

1  A.  It's my duty to execute call strategies set

2     forth by our analytics and collection

3     operations people.

4  Q.  Mr. Ellison, are you aware that you're here

5     today as a corporate representative?

6  A.  Yes.

7        MR. BURKE:  Is there a copy of

8     the notice of deposition there?

9        THE COURT REPORTER:  Yes, there

10    is.

11       MR. BURKE:  Okay.  Would you

12    please mark that as Exhibit A and tender it

13    to the witness?

14      (Deposition Exhibit Letter A was

15    marked for identification.)

16       MR. PEDERSON:  Just for clarity,

17    can you identify the date of the deposition

18    notice that you're talking about, Alex,

19    because there have been a couple of

20    different notices, and they listed different

21    subjects?

22       MR. BURKE:  So the deposition

23    notice that I believe the witness has has a

24    certificate of service dated January 12th,

25    2010 on the second page.

---

**6**

1     BY MR. BURKE:

2  Q.  Would that be correct, Mr. Ellison?

3  A.  I haven't seen the copy yet.

4       THE COURT REPORTER:  (Hands

5    exhibit.)

6       THE WITNESS:  That's correct.

7     BY MR. BURKE:

8  Q.  And for the record, if you turn to the first

9    page, we are not dealing with the topic in

10    the third box.

11  A.  Okay.

12  Q.  Would you please read topic one or the first

13    topic to yourself?

14  A.  (Reviews document.)

15  Q.  Are you competent to testify as to that

16    subject?

17  A.  Yes.

18  Q.  Have you been designated by IC System,

19    Incorporated to testify on that subject?

20  A.  Yes.

21  Q.  Same questions as to topic two.  Let's take

22    a minute.

23  A.  (Reviews document.)

24  Q.  Are you competent to testify on that topic?

25  A.  Yes.

---

**7**

1  Q.  Have you been designated by IC System,

2    Incorporated to testify on its behalf as to

3    that topic?

4  A.  Yes.

5  Q.  Great.  How long have you worked at IC

6    System?

7  A.  18 years.

8  Q.  When you began 18 years ago, what did you do

9    at IC System?

10  A.  I started as a collector.

11  Q.  Over the 18 years, can you give me the

12    highlights of changes in positions, from

13    collector to --

14  A.  I went from a collector to a collection

15    supervisor, to a collection operations

16    manager, to my current position.

17  Q.  When did you go from collection operations

18    manager to dialer operations manager?

19  A.  Approximately four years ago.  I believe it

20    was January of '07.

21  Q.  When you say "dialer," what do you mean?

22  A.  Our automated dialer systems.

23  Q.  How many dialers does IC System have?

24  A.  Five.

25  Q.  Where are they located?

---

**8**

1  A.  They're all in the St. Paul office.

2  Q.  If IC System wants to call a debtor using

3    its dialer, how does it do so?

4  A.  The list is generated off our host system.

5    The phone number would have to be attached

6    to an account that's been placed with IC

7    System, then downloaded to our dialer.

8  Q.  And you say a list.  Would you be referring

9    to, for example, a campaign to collect a

10    list of certain debts?

11  A.  Yes.

12  Q.  So would it be accurate to say that someone

13    at IC System either -- someone at IC System

14    decides that a dialling campaign should

15    happen, so they query the database to put

16    together a list of accounts that they went

17    to collect?

18  A.  Yes.  That would be correct.

19  Q.  Then those accounts are sent to the dialer,

20    and the dialer dials the account; is that

21    right?

22  A.  Yes.

23  Q.  How does a dialer decide which accounts to

24    call when?

25  A.  Well, the dialer can be -- well, you can

9

1    change or you can select a sort on the
2    dialer to call it in whichever order you
3    wish to call those accounts in.
4  Q.  Okay.  Does the dialer also sometimes decide
5    when to make the phone calls?
6  A.  If we do not specify a certain order, then
7    yes, it will dial.
8  Q.  So it would decide what order to dial the
9    phone numbers in?
10  A.  Yes.
11  Q.  Do your dialers have capability of
12    intelligently deciding what time of day to
13    call particular dialers -- debtors?
14  A.  Not necessarily what time of day, but it
15    does not allow to call phone numbers that
16    are not within our legal calling times.
17  Q.  So my question is -- you know, some people
18    work during the day, some people don't.  I
19    would guess that some phone calls, for
20    example, at dinner time are more effective
21    at getting someone to answer than those that
22    are called in the morning on a weekday.
23        Does the dialer make any
24    decisions as to what time of day to call
25    people?

10

1  A.  No, it does not.
2  Q.  As to the plaintiff's account, do you know
3    whether the campaigns were the type of
4    campaigns where the dialer decided what
5    order to call or whether a human being
6    decided what order to call?
7        MR. PEDERSON:  Objection to the
8    question, compound.  You can answer, Scott.
9        THE WITNESS:  Can you repeat
10    that, please?
11  BY MR. BURKE:
12  Q.  I'm just trying to figure out as to the
13    plaintiff in this case, Diego Frausto,
14    whether you know whether the calls to Diego
15    were the type of calls where the dialer
16    decided when to call or when -- or the type
17    of calls where the -- where some person
18    decided what order to call him in?
19  A.  No.  I do not know how it was set for that
20    day.
21  Q.  Would it be accurate to say that sometimes
22    the dialer leaves messages for debtors?
23  A.  Yes.
24  Q.  And those messages that the dialer leaves,
25    are those messages that were recorded ahead

11

1    of time?
2  A.  Yes.
3  Q.  So when a person picks up and the dialer
4    decides to leave a message, it plays this
5    message -- the same message to each person
6    who picks up; is that right?
7  A.  Yes.
8  Q.  Does it ever happen at IC System that a
9    debtor answers and IC System is able to have
10    a live operator on its end of the call when
11    the dialer calls?
12  A.  Yes.
13  Q.  Can you give me some idea of maybe a
14    percentage of calls when there's an operator
15    available to speak to the recipient of a
16    call?
17  A.  I would say 85 to 90 percent.
18  Q.  So if there's nobody available at IC System,
19    then it just leaves a prerecorded message;
20    is that right?
21  A.  Well, we're actually talking about two
22    different types of dialer campaigns.
23  Q.  Okay.  Can you explain the two different
24    kinds, please?
25  A.  The campaign where we have agents attached

12

1    to -- available to take the calls on a
2    connect, those calls do not leave any
3    automated messages.  And then if we choose
4    to run a campaign or job with automated
5    messages, that typically will be all we run,
6    are calls to be -- to leave messages.
7  Q.  Does it ever happen that IC System uses its
8    dialer to call someone, the person answers,
9    and there's an agent -- an IC System person
10    available and those people speak, and then
11    after they speak a prerecorded message is
12    played?
13  A.  No.
14  Q.  When the dialer is making calls, who is
15    dialing the phone numbers?  Is it the dialer
16    or a human being or something else?
17  A.  It's the dialer.
18  Q.  Does IC System intend to call people using
19    its dialer?
20  A.  Yes.
21  Q.  Does IC System intend to call people using
22    its prerecorded messages?
23  A.  Yes.
24  Q.  Are there any instances that you can think
25    of where IC System called someone using its

## 13

1   dialer but didn't intend to do so?
2          MR. PEDERSON: Objection, calls
3   for speculation, but the witness can answer
4   if he knows.
5          THE WITNESS: No. No. I don't
6   believe so.
7   BY MR. BURKE:
8   Q.  Did IC System intend to call Diego Frausto
9   using its dialer?
10  A.  Yes.
11  Q.  We've been talking about how the dialer
12  works and how the prerecorded messages work.
13  Thinking back over the last three years, in
14  your experience as dialer operations
15  manager, would you say that the dialers have
16  substantially changed such that the answers
17  to these questions might have been
18  different?
19         MR. PEDERSON: Objection to the
20  form of the question. It's vague. The
21  witness can answer to the extent he
22  understands the question.
23         THE WITNESS: No. I don't
24  believe so.
25  BY MR. BURKE:

## 14

1   Q.  No, they haven't changed?
2   A.  No.
3          MR. PEDERSON: And a related
4   objection is that the witness testified that
5   there are five dialers, and all of these
6   questions have been stated in terms of the
7   dialer.
8          MR. BURKE: Okay. I'll clarify
9   that.
10  BY MR. BURKE:
11  Q.  I have been asking about the dialers. Do
12  all the dialers work substantially the same?
13  A.  Yes.
14  Q.  Okay. So the answers to my questions
15  regarding how you load people's information
16  into the dialers, would those answers be the
17  same for all five dialers?
18  A.  Yes.
19  Q.  And the intent questions as well, would
20  those be the same for all five dialers?
21  A.  Yes.
22  Q.  As part of the dialing campaign, will the
23  dialer ever call any particular number more
24  than once?
25  A.  Within a dialling campaign?

## 15

1   Q.  Right.
2          MR. PEDERSON: I'm going to
3   object to the form of the question as vague
4   and lacking foundation, because there's no
5   definition of what a campaign is. Subject
6   to that, the witness can answer.
7          THE WITNESS: Yes.
8   BY MR. BURKE:
9   Q.  Can you explain to me what a dialing
10  campaign is, please?
11  A.  A dialing campaign is simply a -- what we
12  call a dialer job or a list of accounts that
13  we actually dial on the auto dialer.
14  Q.  So would it be accurate to say, then, that
15  sometimes as part of the campaign, the
16  dialer would call a particular number twice?
17  A.  If we instruct it to do so.
18  Q.  Would it ever call a particular number twice
19  in a campaign where it's the dialer that's
20  deciding who to call when?
21  A.  Yes.
22  Q.  Is there a certain term that's given to the
23  type of campaign where the dialer is
24  deciding who to call when?
25  A.  No, there is not.

## 16

1   Q.  So is it just like a programming designation
2   when the campaign is initiated?
3   A.  Yes.
4   Q.  Mr. Ellison, is there anyone in the room
5   other than you and the court reporter?
6   A.  Yes, there is.
7   Q.  Who is in the room?
8   A.  Don Fitzgerald.
9   Q.  Who is Don Fitzgerald?
10  A.  He is IC System's attorney.
11  Q.  Have you been communicating with
12  Mr. Fitzgerald at all during this
13  deposition?
14  A.  No.
15         MR. PEDERSON: Mr. Fitzgerald is
16  the corporate representative of the
17  defendant.
18         MR. BURKE: You mean as like a
19  corporate representative observer?
20         MR. PEDERSON: Right.
21         MR. BURKE: That's all I have for
22  today on these subjects.
23         MR. PEDERSON: I have a little
24  bit of follow-up.
25

17

1      * * *
2      EXAMINATION
3      * * *
4   BY MR. PEDERSON:
5   Q.  Mr. Ellison, earlier you testified that in
6       some campaigns the dialer will decide the
7       order in which the phone numbers included in
8       the campaign are dialed; is that correct?
9   A.  Yes.
10  Q.  And in other campaigns an employee of IC
11      will set the -- will control the order in
12      which the phone numbers included in the
13      campaign are called by the dialer; is that
14      correct?
15  A.  That's correct.
16  Q.  How often does an IC employee control the
17      order in which the numbers included in the
18      campaign are called?
19  A.  It's typical for us to do that.  A very high
20      percentage of the campaigns do have a -- the
21      sort set to a certain value that operations
22      may want.
23  Q.  In the case of a campaign where the dialer
24      is selecting the order in which the numbers
25      are called, is it true that a human being

18

1       employed by IC System will still be
2       responsible for deciding what numbers are
3       included in that campaign in the first
4       place?
5   A.  Yes.  This is within a campaign that I'm
6       referring to, as far as how the numbers are
7       dialed or the order in which the accounts
8       are dialed.
9   Q.  Does a human being employed by IC set the
10      criteria for selecting the numbers that are
11      included in a dialing campaign in the case
12      of all of the company's dialing campaigns?
13  A.  Yes.
14  Q.  How long does a dialing campaign typically
15      last?
16  A.  We don't really have a typical time frame.
17      We have some very small campaigns, and we
18      have some very large campaigns.  Some will
19      last a half hour.  We have others that will
20      last the entire workday.
21  Q.  Will they ever last longer than a day?
22  A.  No, they cannot.  We rebuild our list each
23      night.
24  Q.  When IC System uses its dialing technology
25      to call people, does it intend to comply

19

1       with the Telephone Consumer Protection Act?
2   A.  Yes.
3           MR. PEDERSON:  I don't have
4       anything further.
5           MR. BURKE:  I just have a couple
6       on redirect.
7       * * *
8       REDIRECT EXAMINATION
9       * * *
10  BY MR. BURKE:
11  Q.  If the dialer calls as part of the campaign
12      where the -- where a person decides what
13      order the calls will be in and nobody
14      answers the phone call, will the dialer try
15      again later?
16  A.  The dialer has the ability to do that, but
17      it would depend on how the settings on that
18      campaign are set up.
19  Q.  Typically how is that setting set for
20      campaigns?
21  A.  Typically we would not call that back within
22      that campaign.
23          MR. BURKE:  I think that's all.
24          MR. PEDERSON:  Well, we will
25      reserve signature.

20

1           MR. BURKE:  So we're off the
2       record.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



21

1 S I G N A T U R E  P A G E
2
3 CASE:  DIEGO FRAUSTO vs. IC SYSTEM, INC.,
4 DATE OF DEPOSITION:  January 14, 2011
5  I, SCOTT ELLISON, deponent,
  certify that I have read the foregoing
6 transcript of my testimony and have made the
  following corrections and/or changes and the
7 reason why:
8 PAGE:  LINE:  CHANGE:
9
10
11
12
13
14
15
16
17 _____
   SCOTT ELLISON
18
19 _____  _____
20 AFFIX SEAL  NOTARY PUBLIC

   Dated this _____ day
21 of_____,20_____.
22
  Please return to:
23
  Laurie A. Kjelden
24 5171 St. Albans Street North
  Shoreview, Minnesota 55126
25

22

1 STATE OF MINNESOTA )
2
  COUNTY OF RAMSEY   )
3
4  Be it known that I took the
  deposition of SCOTT ELLISON on January 14,
5 2011;
6  That I was then and there a
  notary public in and for the County of
7 Ramsey, State of Minnesota, and that by
  virtue thereof I was duly authorized to
8 administer an oath;
9  That the witness before
  testifying was by me first duly sworn to
10 testify the whole truth and nothing but the
  truth relative to said cause;
11
  That the testimony of said
12 witness was recorded in stenotype by myself
  and transcribed into typewriting under my
13 direction, and that the deposition is a true
  record of the testimony given by the witness
14 to the best of my ability;
15  That I am not related to any
  of the parties hereto nor interested in the
16 outcome of the action;
17  That the reading and signing
  by the witness and Notice of Filing were not
18 waived;
19
  Witness my hand and seal this
20 20th day of January, 2011.
21
22
   LAURIE A. KJELDEN
23  COURT REPORTER
24
25

# Exhibit D

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DIEGO FRAUSTO,           )
        Plaintiff,       )
    vs.                  ) No. 10-cv-1363
IC SYSTEM, INC.,         ) Judge Zagel
        Defendant.       )

The deposition of DIEGO IVAN FRAUSTO, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before BRENDA S. TANNEHILL, a notary public within and for the County of Kane and State of Illinois, at 222 North LaSalle Street, Suite 300, Chicago, Illinois, on January 18, 2011 at the hour of 1:41 o'clock p.m.

REPORTED BY:  Brenda S. Tannehill, CSR, RPR, CRR
LICENSE NO.  084-003336

Page 2

1     APPEARANCES:
2        BURKE LAW OFFICES, LLC
3        BY MR. ALEXANDER H. BURKE
4        155 North Michigan Avenue, Suite 9020
5        Chicago, Illinois 60601
6        (312) 729-5288
7        Aburke@BurkeLawLLC.com
8           Representing the Plaintiff;
9
10       HINSHAW & CULBERTSON, LLP
11       BY MR. PETER E. PEDERSON
12       222 North LaSalle Street, Suite 300
13       Chicago, Illinois 60601
14       (312) 704-3000
15       ppederson@hinshawlaw.com
16          Representing the Defendant.
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2     WITNESS              EXAMINATION
3     DIEGO IVAN FRAUSTO
4       By Mr. Pederson          5
5       By Mr. Burke             39
6     Further Examination
7       By Mr. Pederson          42
8
9
10
11           E X H I B I T S
12    NUMBER              MARKED FOR ID
13    Frausto Deposition Exhibit
14      No. 1                   11
15      No. 2                   18
16      No. 3                   23
17      No. 4                   25
18      No. 5                   28
19
20
21
22
23
24

Page 4

1              (Whereupon, the witness was
2              duly sworn.)
3         MR. PEDERSON:  Mr. Frausto, please
4     state your full name for the record.
5         THE WITNESS:  Diego Ivan Frausto.
6         MR. PEDERSON:  Let the record reflect
7     that this is the deposition of Diego Frausto in
8     the action entitled Diego Frausto versus IC
9     System, Inc. which is pending in the U.S.
10    District Court for the Northern District of
11    Illinois.
12         Thank you for coming in today,
13    Mr. Frausto.
14         My name is Pete Pederson, and I
15    represent the defendant, IC System, in your
16    lawsuit, and I'm going to ask you a series of
17    questions about the lawsuit.  Before we get into
18    the details, let me just go over a couple of
19    preliminaries.
20         DIEGO IVAN FRAUSTO,
21    called as a witness herein, having been first
22    duly sworn, was examined and testified as
23    follows:
24

Draft Copy

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Brenda  Tannehill (001-135-783-7494)                    dadd63c0-1d66-4184-aaba-e460bee3a9f7

Page 5

EXAMINATION
BY MR. PEDERSON:
Q. First of all, do you have any medical condition that would interfere with your ability to testify truthfully today?
A. No.
Q. Have you taken any medication or drugs that would interfere with your ability to testify truthfully?
A. No.
Q. Okay. Have you ever given a deposition before?
A. No.
Q. Okay. As you can see, the court reporter is typing or transcribing a copy of all of my questions and all of your answers. So that she can take down the words we're saying accurately, only one of us can speak at a time so let me complete my questions before you begin your answers so that we have an accurate transcript even when you know where I'm going to go with a question, which will probably happen a couple of times today.
Also, because of the court reporter

Page 6

making the transcript, your answers have to be verbal, they can't be in the form of body language or shrugs of the shoulder or nods of the head or shaking of the head.
And last, we can take a break whenever you want to, but I do ask that you answer any question that is pending before we go on break.
Q. What is your date of birth?
A. ▮▮▮▮▮▮▮▮
Q. ▮
A. Uh-huh.
Q. And what is your residence address?
A. ▮▮▮▮▮▮▮▮▮▮▮
Q. What's the highest level of education you've completed?
A. I'm currently in college, university.
Q. Okay. What college are you going to?
A. Loyola University.
Q. What are you studying there?
A. International business.
Q. And how close to completing the degree are you?
A. Three semesters away.

Page 7

Q. So are you a junior then?
A. Uh-huh, yes.
Q. Are you currently employed?
A. Yes.
Q. Who is your employer?
A. Rosetta Stone, LTD.
Q. And what is Rosetta Stone?
A. A language software company.
Q. And where are you employed for Rosetta Stone?
A. The retail division so I work here on Michigan Avenue at a kiosk selling the program.
Q. Okay. And what is the location of the kiosk?
A. It's ▮▮▮▮▮▮▮▮▮▮▮▮.
Q. Is that inside a mall?
A. Yes.
Q. And what's your title at Rosetta Stone?
A. Sales associate.
MR. BURKE: Pete, for the birthday and the address information, we'd ask that that stuff be redacted if the transcript is filed.
MR. PEDERSON: Fair enough.

Page 8

BY MR. PEDERSON:
Q. Did you also complete your high school degree?
A. Yes.
Q. Where did you go to high school?
A. I went three years in France and then one year in Buffalo Grove High School.
Q. And where did you obtain your high school diploma?
A. ▮▮▮▮▮▮▮▮▮▮
Q. And what year was that?
A. 2007, I think.
Q. Have you ever been a party to any other legal proceedings either as a defendant or a plaintiff?
A. Yes, I am now currently.
Q. Beyond this suit, have you been involved as a plaintiff or a defendant in any other lawsuits?
A. Yes.
Q. Okay. What are those other suits?
A. There's one. Again, it's a restaurant that showed the expiration date on my receipt.
Q. And who represents you in that case?

2 (Pages 5 to 8)

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

Page 9

1    A.  I can't recall the name of the lawyer.
2    Q.  Is it Brian Vanca?
3    A.  I can't recall.
4    Q.  What's the current status of that
5  lawsuit?
6    A.  Pending.
7    Q.  All right.  When was it filed?
8    A.  I can't recall.
9    Q.  Do you know, is there a trial date in
10  the lawsuit?
11    A.  Not yet.
12    Q.  Has the class been certified?
13    A.  I don't know.
14    Q.  Is it possible that this case was
15  decided in the district court and then went up
16  to the Seventh Circuit Court of Appeals?
17    A.  No.  The one we're talking about,
18  right?
19    Q.  Yeah.
20    A.  No.
21    Q.  So it's still in the district court?
22    A.  I'm not sure.  I believe so.
23    Q.  Who is the defendant in that suit?
24    A.  Ripple, R-I-P-P-L-E.

Page 10

1    Q.  Have you been a plaintiff or a
2  defendant in any other lawsuits besides the case
3  against Ripple and the current lawsuit?
4    A.  No.
5    Q.  So you've only been a party to two
6  lawsuits then?
7    A.  Yes.
8    Q.  Is the allegation you have made in the
9  Ripple lawsuit that the restaurant violated the
10  Fair Credit Reporting Act by printing more than
11  the last five digits of your credit card on a
12  paper receipt?
13    A.  Correct.
14    Q.  And was it a paper receipt involved in
15  that case?
16    A.  Yes.
17    Q.  Have you ever filed for bankruptcy
18  protection?
19    A.  No.
20    Q.  I served on your counsel, Mr. Burke, a
21  set of questions that are called
22  interrogatories, and in one of those
23  interrogatories -- did you assist Mr. Burke in
24  responding to the interrogatories?

Page 11

1    A.  Yes.
2    Q.  In one of the interrogatory questions,
3  we asked whether you were a party in any other
4  litigation.  Do you recall answering that
5  question?
6    A.  I don't recall.
7    Q.  Well, let me just mark the
8  interrogatories as an exhibit.
9      MR. PEDERSON:  Will you mark this as
10  Exhibit 1, please?
11         (Whereupon, Frausto Deposition
12         Exhibit No. 1 was marked for
13         identification.)
14  BY MR. PEDERSON:
15    Q.  Please take a minute, Mr. Frausto, and
16  take a look at what's been marked as Exhibit
17  No. 1, and then I want to ask you in particular
18  about your response to Question Number 9 in
19  Exhibit 1.
20      Have you ever seen this document
21  before, Mr. Frausto?
22    A.  I believe I have.
23    Q.  Would you turn your attention to the
24  last page, to Page 9?  It says, "Certification

Page 12

1  of Diego Frausto" at the top.
2    A.  Uh-huh.
3    Q.  Is that your signature?
4    A.  Yes.
5    Q.  And did you sign this document for the
6  purpose of verifying that the interrogatory
7  answers were correct?
8    A.  Correct.
9    Q.  Question Number 9 asked if you've been
10  a party to any other lawsuits, and the answer
11  is, quote, "Plaintiff is not aware of having
12  been a party to any other lawsuit," close quote.
13      Do you see that?
14    A.  Yes.
15    Q.  Why didn't you disclose the Fair Credit
16  Reporting Act case against the restaurant in
17  response to this question?
18    A.  I had probably forgotten.
19    Q.  Okay.  And what jogs your memory about
20  this lawsuit?
21    A.  Because I recently received an e-mail
22  relating to that so that's fresh in my mind.
23    Q.  Okay.  Do you know approximately how
24  long ago that lawsuit was filed?

3  (Pages 9 to 12)

Electronically signed by Brenda  Tannehill (001-135-783-7494)                    dadd63c0-1d66-4184-aaba-e460bee3a9f7

Page 13

1   A.  I can't remember.
2   Q.  Okay.
3        MR. BURKE:  Can I take just a minute
4   with Diego?
5        MR. PEDERSON:  Yeah.
6            (Whereupon, a short recess
7             was taken.)
8        MR. PEDERSON:  Back on the record.
9   BY MR. PEDERSON:
10   Q.  Do you have a cell phone number,
11  Mr. Frausto?
12   A.  Yes.
13   Q.  What is your cell phone number?
14   A.  ▮▮▮▮▮▮7867.
15   Q.  What company provides the phone service
16  associated with that number?
17   A.  T-Mobile.
18   Q.  How long have you had the phone number
19  ▮▮▮▮▮▮7867?
20   A.  I can't recall how long, but I can give
21  an estimate.
22   Q.  Okay.
23   A.  Like 2006.
24   Q.  Has the number ▮▮▮▮▮7867 always

Page 14

1   been assigned to a cell phone?
2   A.  I believe so.
3   Q.  Okay.  I mean, you know numbers can be
4   ported, right?
5   A.  Yeah.
6   Q.  And to your knowledge, has that number
7   ever been ported from a landline to a cell phone
8   or vice versa?
9   A.  No.  I believe it's always been a cell
10  phone.
11   Q.  And are you the primary user of that
12  number?
13   A.  Yes.
14   Q.  Are you the only user of that number?
15   A.  Yes.
16   Q.  Have you always been the sole user of
17  that number?
18   A.  Yes.
19   Q.  Okay.  Do you have any other phone
20  numbers where you can be reached at?
21   A.  Yes.
22   Q.  Okay.  What are the other numbers?
23   A.  My house phone.
24   Q.  Is that a wired line or a landline?

Page 15

1   A.  It's a landline.
2   Q.  And what is that number?
3   A.  ▮▮▮▮▮▮9946.
4   Q.  And do you share that number with other
5   people?
6   A.  Not really.
7   Q.  So that is also your exclusive number?
8   A.  It's my house number where I live with
9   my family so it's our family number.
10   Q.  Well, who do you live with in your
11  house?
12   A.  My parents.
13   Q.  So they use it?
14   A.  Yes.
15   Q.  Does anyone else use it?
16   A.  My sisters, the family.
17   Q.  Is it fair to say that the cell phone
18  number ending with the digits 7867 is your
19  primary phone number?
20   A.  Yes.
21   Q.  When you open an account with a
22  merchant and the merchant requires you to
23  provide a contact number, do you typically
24  provide the cell phone number ending in 7867?

Page 16

1   A.  Most of the time, yes.
2   Q.  You had an account with PayPal,
3   correct?
4   A.  Correct.
5   Q.  When did you open the PayPal account?
6   A.  Again, I can't recall exactly when, but
7   probably 2007, 2008.
8   Q.  And how did you open your PayPal
9   account?
10   A.  Online.
11   Q.  So did you use your web browser to
12  access the PayPal website?
13   A.  Yes.
14   Q.  And did you fill out some information
15  forms through your web browser?
16   A.  You mean like input the -- yes.
17   Q.  And did you give PayPal the cell phone
18  number ending with the four digits 7867?
19   A.  I can't remember if I gave them that
20  number.
21   Q.  Did you give them any phone number?
22   A.  I'm not sure.
23   Q.  What information did you provide to
24  PayPal when you opened the account?

4 (Pages 13 to 16)

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Page 17

1    A.  I don't remember.  It was a while ago.
2    Q.  Okay.  When you opened your account,
3  were you asked to agree to the terms of the
4  PayPal user agreement?
5    A.  I believe I was.
6    Q.  Okay.  And did you agree to the terms
7  of the PayPal user agreement?
8    A.  Yes.
9    Q.  Did you review the user agreement
10  before you indicated your agreement to the
11  terms?
12    A.  Like read through?
13    Q.  Yeah.
14    A.  Yeah.
15    Q.  You did?
16    A.  Yes.
17    Q.  Okay.  And how did you indicate your
18  agreement to the terms of the user agreement?
19    A.  How did I indicate that I read it?
20    Q.  And that you accepted the terms.
21    A.  I can't remember, but I most likely
22  clicked on "Accept terms."
23    Q.  Okay.  Did you ever save or print a
24  copy of the user agreement?

Page 18

1    A.  No.
2    Q.  So you don't have like a PDF copy or
3  other Word type document or file on your
4  computer that would contain the terms of the
5  agreement you agreed to?
6    A.  Correct, I don't.
7    MR. PEDERSON:  Please mark this as
8  Exhibit 2.
9        (Whereupon, Frausto Deposition
10        Exhibit No. 2 was marked for
11        identification.)
12  BY MR. PEDERSON:
13    Q.  Please turn to Exhibit A in the
14  document that's been marked as Deposition
15  Exhibit 2 and take a moment to review the
16  document.  Exhibit A is about ten pages in.
17  It's a 34-page-long user agreement.
18        Is Exhibit A within Deposition Exhibit
19  No. 2 a copy of the user agreement with PayPal
20  that you would have agreed to at the time you
21  opened your PayPal account?
22    A.  I don't know.  I mean, it's 34 pages so
23  I can't recall.
24    Q.  Let me ask you this.  Do you know

Page 19

1  whether the PayPal user agreement stated that
2  PayPal could contact you at the phone number you
3  provided using autodial with prerecorded message
4  calls?
5    A.  Yes, PayPal could contact me.
6    Q.  And you recall that the agreement
7  included a provision to that effect; is that
8  correct?
9    A.  Yes, that PayPal could contact me at
10  the number.
11    Q.  Okay.  What did the user agreement say
12  about how PayPal would share your personal
13  information with other companies or people?
14    A.  I can't recall that.
15    Q.  Okay.  At any time did you review
16  PayPal's privacy policy?
17    A.  Yes, but I can't remember.  I mean,
18  it's been a while.
19    Q.  Okay.  When would you have reviewed
20  PayPal's privacy policy?
21    A.  Well, it's in the user agreement I
22  would have agreed to.
23    Q.  It's linked from the user agreement?
24    A.  Then that would be the time I saw it.

Page 20

1    Q.  So are you indicating then that you
2  would have reviewed the privacy policy at the
3  same time you reviewed the user agreement?
4    A.  If the privacy policy is in here, then
5  yes.
6    Q.  It's a hypertext link to the PayPal --
7  or from the PayPal user agreement.
8    A.  Yes, I would have reviewed it then.
9    Q.  Okay.  Did you ever print or save a
10  copy of the PayPal privacy policy?
11    A.  No.
12    Q.  Please take a look at the document
13  which is marked Exhibit B within Deposition
14  Exhibit No. 1.  That's like the last five
15  pages -- I'm sorry.  It's Exhibit B within
16  Deposition Exhibit No. 2 which is around the
17  last five pages of Deposition Exhibit No. 2.
18        Is Exhibit B a copy of the PayPal
19  privacy policy that you reviewed at the time you
20  opened your PayPal account?
21    A.  Yeah, I can't remember if this is the
22  exact one word for word.
23    Q.  Okay.  Well, let me ask you this then.
24        Do you recall whether the PayPal

5 (Pages 17 to 20)

Electronically signed by Brenda Tannehill (001-135-783-7494)                    dadd63c0-1d66-4184-aaba-e460bee3a9f7

Page 21

1  privacy policy stated that PayPal would use your
2  personal information to resolve disputes and
3  collect fees?
4      A.  That is correct.
5      Q.  Okay.  And do you recall whether the
6  PayPal privacy policy stated that PayPal would
7  use your personal information to enforce the
8  terms of the user agreement?
9      A.  I can't remember.
10     Q.  Did the privacy policy state that
11 PayPal could share your personal information
12 with service providers who provided help with
13 bill collection?
14     A.  Again, I can't remember if I read that.
15     Q.  What is the current status of your
16 PayPal account?
17     A.  I believe it's been closed.
18     Q.  Okay.  And why was it closed?
19     A.  There was a dispute with -- I used
20 eBay, which I would use PayPal as the payment,
21 and there was a dispute with eBay for something
22 I had sold online.
23     Q.  Okay.  So you used your PayPal account
24 to process transactions, to process payments for

Page 22

1  transactions on eBay?
2      A.  Correct.
3      Q.  Did you use your PayPal account for any
4  other purposes?
5      A.  No.  Solely for eBay.
6      Q.  Okay.  In May of 2009, did you have
7  occasion to sell a handbag to ████████ through
8  eBay?
9      A.  Yes, that is correct, I sold him the
10 bag.
11     MR. PEDERSON:  Please mark this as
12 Exhibit 3.
13     MR. BURKE:  We'd ask that all
14 identifying information of ████████ including
15 his name please be redacted.
16     MR. PEDERSON:  Okay.  Well, I'm not
17 sure that that's properly subject to the
18 protective order.  It's something we can
19 probably work out, but we don't need to resolve
20 it now.  If you're designating it as
21 confidential, then it's confidential.
22     MR. BURKE:  We'll designate it as
23 confidential, and then you and I can discuss it
24 offline.

Page 23

1      (Whereupon, Frausto Deposition
2      Exhibit No. 3 was marked for
3      identification.)
4  BY MR. PEDERSON:
5      Q.  Here's a copy of what's been marked
6  Deposition Exhibit No. 3.  Please take a second
7  and review the e-mails printed on Deposition
8  Exhibit No. 3.
9      Are the e-mails on Deposition Exhibit
10 No. 3 e-mails concerning the sale of the handbag
11 to ████████
12     A.  That is correct.
13     Q.  Okay.  Tell me generally what the terms
14 of the transaction between you and Mr. ████
15 were.
16     A.  Well, I sold him the product.  He had
17 seen pictures of it online.  I sent the product
18 after I received payment, and he claimed the
19 product was damaged, which it was not.
20     He then tried to return the bag, and I
21 offered to -- I offered to give him most of the
22 money back minus a 20 percent restocking fee
23 because the bag was not damaged.
24     When I sold it through eBay, I did not

Page 24

1  click "Accept returns."
2      He refused, and he went through -- I'm
3  not sure if it was PayPal or eBay who does the
4  dispute.  I think it was eBay -- or sorry --
5  PayPal.  And PayPal ruled against me.
6      And when I received the product, the
7  bag was damaged, and that's not how I sent it so
8  I thought that I should not be responsible for
9  that money.
10     Q.  Okay.  You used the term "restocking
11 fee."
12     A.  Yes.
13     Q.  What do you mean by a restocking fee?
14     A.  My time in terms of packing and driving
15 to the post office and all that.  The hassle, I
16 guess.
17     Q.  Okay.  What was the --
18     A.  I didn't have to accept the return.  He
19 knew it was a final sale.  That was me trying to
20 work with him.
21     Q.  What was the price that Mr. ████ paid
22 for the bag?
23     A.  Over 200.  I don't remember exactly the
24 dollar amount.

6 (Pages 21 to 24)

Electronically signed by Brenda  Tannehill (001-135-783-7494)                                    dadd63c0-1d66-4184-aaba-e460bee3a9f7

Page 25

1    Q.  Okay.  And was the buyer's payment
2  processed through PayPal?
3    A.  Yes.
4    Q.  And so the purchase price was
5  transferred to your PayPal account; is that
6  correct?
7    A.  Yes.
8    Q.  Okay.
9    A.  Minus the fees from PayPal.
10    Q.  Do you remember what fees PayPal
11  charged?
12    A.  I can't recall.
13    MR. PEDERSON:  I've got to step out to
14  get a stapler.  I'll be right back.
15        (Whereupon, a short recess
16         was taken.)
17    MR. PEDERSON:  Please mark this as the
18  next exhibit.
19        (Whereupon, Frausto Deposition
20         Exhibit No. 4 was marked for
21         identification.)
22  BY MR. PEDERSON:
23    Q.  Please take a look at the page that's
24  marked Frausto 16 in the lower right corner.

Page 26

1        Do you see that this document
2  references a transaction amount of $254.41?
3    A.  Correct.
4    Q.  And then below that, it references a
5  refund amount of $243?
6    A.  Yes.
7    Q.  And this is a July 24th, 2009, e-mail
8  from service@paypal.com to
9  frausto1988@yahoo.com?
10    A.  Yes.
11    Q.  Is ███████████████████ your e-mail
12  address?
13    A.  Yes, one of my e-mail addresses.
14    Q.  Okay. Is that the e-mail address you
15  provided to Pay  Pal?
16    A.  Yes.
17    Q.  I'm trying to understand the terms of
18  the transaction.  Does this document indicate
19  that the purchase price was $254.41?
20    A.  Yes.  That is -- I'm not exactly sure,
21  I can't remember, but based on this, that is
22  what I would imagine.  I would imagine the 243
23  below that is after they took their fees.
24    Q.  Okay.  And the beginning of the e-mail

Page 27

1  says, quote, "We have completed our
2  investigation and have decided in favor of the
3  buyer," close quote.
4        Do you see that in the first paragraph?
5    A.  Yes, I see it.
6    Q.  So is it your understanding that PayPal
7  issued a refund to the buyer in the amount of
8  $243?
9    A.  Well, it says, "Affirm your PayPal
10  account --
11    THE COURT:  Affirm your?
12    MR. BURKE:  Speak slowly so she can get
13  it.
14    THE WITNESS:  Can you ask it again?
15  BY MR. PEDERSON:
16    Q.  Yeah.
17        Is it your understanding that PayPal
18  issued a refund to the buyer in the amount of
19  $243?
20    A.  I'm not sure if it was 243 or 254.41.
21    Q.  Okay.
22    A.  I don't know what he got.  I know that
23  he was issued a refund.
24    Q.  Okay.  Did PayPal apply a debit to your

Page 28

1  account?
2    A.  Again, you mean they took that money
3  out of my account?
4    Q.  Out of your PayPal account.
5    A.  Yes, yes.  I ended up being in the
6  negative with PayPal.
7    Q.  Okay.  And what was the negative
8  balance of your account with PayPal?
9    A.  I can't remember now.
10    Q.  Was it around $240?
11    A.  It was, yeah, correct.
12    Q.  Okay.  Did you ever pay any part of the
13  negative balance on your PayPal account arising
14  from this dispute with the buyer?
15    A.  No.
16    MR. PEDERSON:  Would you mark this as
17  Exhibit No. 5?
18        (Whereupon, Frausto Deposition
19         Exhibit No. 5 was marked for
20         identification.)
21  BY MR. PEDERSON:
22    Q.  Can you tell me, Mr. Frausto, in your
23  own words what the document marked as Deposition
24  Exhibit 5 represents?

Electronically signed by Brenda  Tannehill (001-135-783-7494)                    dadd63c0-1d66-4184-aaba-e460bee3a9f7

Page 29

1      A.  eBay seller fees so I had used my eBay
2  account to sell items, and I was paying eBay for
3  the seller fees.
4      Q.  And what transactions or transaction
5  resulted in you owing these fees to eBay?
6      A.  I can't recall because I have sold
7  several things on eBay or I did sell several
8  things on eBay so I'm not sure if this results
9  from this sale or from prior sales before.
10     Q.  Okay.  But it's possible, though, that
11 you paid these fees to eBay in connection with
12 the sale of the handbag that the buyer disputed?
13     A.  That is correct.
14     Q.  And this is an August 4th, 2009,
15 electronic receipt issued by eBay showing a
16 payment by you, Diego Frausto, of 24.95,
17 correct?
18     A.  Correct.
19     Q.  And this receipt was issued by eBay
20 after PayPal decided the buyer's dispute in
21 favor of the buyer, correct?
22     A.  Let me look at the date.
23         Correct.
24     Q.  What is your understanding of the

Page 30

1  relationship between the defendant in this case,
2  IC System, and PayPal?
3      A.  I gave my number to PayPal, and my
4  understanding of the agreement was that PayPal,
5  PayPal alone, could contact me via phone using
6  the robo calls.  That's my understanding.  So, I
7  mean, I agreed to something that PayPal could
8  contact me, nobody else, with that, with those
9  robo calls.
10     Q.  And by "robo calls," what do you mean?
11     A.  An automated dialer.
12     Q.  Calls made with an automated dialer?
13     A.  Yes, correct.
14     Q.  In your own words, what is the
15 relationship between IC System and PayPal?  What
16 service was IC System providing for PayPal?
17     A.  They were collecting debt for PayPal.
18     Q.  Is it fair to say in your understanding
19 that they were attempting to collect the amount
20 you allegedly owed PayPal as a result of this
21 transaction involving the handbag?
22     A.  Yes.
23     Q.  Okay.  Please describe all of your
24 contacts with IC System to the best of your

Page 31

1  recollection.
2      A.  They called me, they informed me that
3  they were trying to collect a debt.
4          I spoke to a representative.  I don't
5  remember her name.  I do remember her saying
6  that -- I do remember telling her that I did not
7  have money at the moment to pay that debt and
8  that I did not feel I needed to pay the debt
9  because I didn't feel it was a valid debt.
10         She said that I should try to get a
11 family member to lend me money so I could repay
12 that money.
13         And I hung up.  I don't remember if
14 I -- I mean, there was probably like, you know,
15 "Thank you" or whatever, and then I hung up.
16     Q.  So did you have only one live
17 conversation with an IC representative?
18     A.  That is correct.
19     Q.  And when did that conversation take
20 place?
21     A.  I don't remember the date.
22     Q.  Was it in August or September of 2009?
23     A.  Yeah, it was probably in August or
24 September.

Page 32

1      Q.  And so this would have been just a few
2  weeks after PayPal decided the dispute with the
3  buyer in favor of the buyer?
4      A.  Yes.
5      Q.  Okay.  And you received correspondence
6  from -- did you receive collection letters from
7  IC?
8      A.  I received one -- yeah, I letter from
9  IC System.
10     Q.  Did you keep a copy of any letters you
11 received from IC?
12     A.  Yeah, I kept a copy of the letter I
13 received from IC System, yes.
14     Q.  And did you give any letters you
15 received from IC System to your lawyer in this
16 case so that they could be produced in this
17 litigation?
18     A.  Yes.
19         MR. BURKE:  If that hasn't been
20 produced, I'll go back through the stuff.  I
21 don't remember if I produced it or not.
22         MR. PEDERSON:  No, you produced a
23 letter.  I just want to make sure I have all the
24 correspondence.

8 (Pages 29 to 32)

Electronically signed by Brenda  Tannehill (001-135-783-7494)                    dadd63c0-1d66-4184-aaba-e460bee3a9f7

Page 33

1    MR. BURKE:  All right.
2    THE WITNESS:  To what I remember, there
3  was just one letter they sent me.
4  BY MR. PEDERSON:
5    Q.  Okay.  And you had only the one phone
6  conversation you've already described?
7    A.  Yes.
8    Q.  Are you aware of any other phone calls
9  made by IC to you?
10    A.  Yeah.  There were several.  There were
11  many calls made to me from IC System.  I never
12  picked up to speak to them.
13    Q.  And how did you know it was IC?
14    A.  Well, the number came up, and I looked
15  them up, and they were IC System.
16    Q.  So you screened the calls then?
17    A.  You mean I would see the number and not
18  pick up?  Correct.
19    And I also sent them a letter.
20    Q.  And what did you say in the letter?
21    A.  That I did not recognize the debt, and
22  I asked them to please stop calling me.
23    Q.  Did you receive any automated or
24  prerecorded voice messages from IC on your

Page 34

1  voicemail?
2    A.  Yes.
3    Q.  Do you know how many?
4    A.  I have a copy of one.  Yeah, I have a
5  copy of one, but I know they called me more than
6  once.
7    Q.  And what did you do with the -- and did
8  they leave messages on those other occasions?
9    A.  I don't remember.
10    Q.  What number did IC call you at?
11    A.  My cell phone number.
12    Q.  Ending in --
13    A.  67.
14    Q.  The number ending with 7867?
15    A.  Yes.
16    Q.  Did they call you at any other number?
17    A.  No.
18    Q.  Is it your understanding that you have
19  filed a complaint in this lawsuit alleging that
20  IC System violated the Telephone Consumer
21  Protection Act?
22    A.  Yes.
23    Q.  Okay.  And is it all right with you if
24  I refer to that statute as the TCPA?

Page 35

1    A.  Correct, yes.
2    Q.  In your own words, how did IC violate
3  the TCPA?
4    A.  They left a message and did not state
5  what the purpose of the call was and who they
6  were.
7    Q.  Okay.  Did they violate the TCPA in any
8  other way?
9    A.  I'm not sure.
10    Q.  Okay.
11    MR. PEDERSON:  I am close to being
12  finished.  I need to look at my notes.
13    MR. BURKE:  Okay.
14    MR. PEDERSON:  Let me take a gander at
15  my notes.
16    MR. BURKE:  I might have some redirect.
17    MR. PEDERSON:  Okay.
18      (Whereupon, a short recess
19        was taken.)
20    MR. PEDERSON:  Back on the record.
21  BY MR. PEDERSON:
22    Q.  I have just a little bit of follow-up.
23    How did you come to retain Mr. Burke as
24  your lawyer in this lawsuit?

Page 36

1    A.  I was referred by somebody.
2    Q.  Okay.  Who referred you?
3    A.  Someone named Nicholas Martin.
4    Q.  And who is that?
5    A.  A friend of mine.
6    Q.  Okay.  And what is the relationship
7  between Nicholas Martin and Mr. Burke?
8    A.  Client-attorney.
9    Q.  Okay.  And did you contact Mr. Burke --
10  I don't want -- I'm not asking you to disclose
11  any communications you had with Mr. Burke as
12  your counsel or any advice he provided you, but
13  I'm entitled to ask you about the general
14  subject matter of conversations and also
15  conversations before the attorney-client
16  relationship existed.  And so my question to you
17  is:  Did you approach Mr. Burke, or did he
18  approach you?
19    MR. BURKE:  Hold on.
20    What relevance does this have if we're
21  not doing class certification issues in this
22  deposition?
23    MR. PEDERSON:  Well, I think it's just
24  general background, and I only have like one or

9 (Pages 33 to 36)

Electronically signed by Brenda  Tannehill (001-135-783-7494)                    dadd63c0-1d66-4184-aaba-e460bee3a9f7

Page 37

1  two questions.
2      MR. BURKE:  How is it possibly going to
3  lead to the discovery of admissible evidence?
4      MR. PEDERSON:  Because it's just
5  general background.
6      MR. BURKE:  But you're done with the
7  deposition.
8      MR. PEDERSON:  No.  I have a few more
9  questions.  I mean, I've gone for barely over an
10 hour.  I have seven hours under the rules.  I'm
11 using less than a seventh of that time.
12     MR. BURKE:  I think this stuff relates
13 to class certification, if anything at all, but
14 go ahead and answer.
15     I don't think that this is appropriate,
16 given your contention that class certification
17 in discovery is stayed, which I don't think is
18 what's going on here, but if you're going to go
19 into class certification discovery, I think that
20 we're prepared to do that, but if you're not
21 going to go into class certification discovery,
22 I think that you are not entitled to ask these
23 questions.  These are not questions that are
24 appropriate in a regular deposition in an

Page 38

1  individual case.
2      MR. PEDERSON:  Are you instructing the
3  witness not to answer?
4      MR. BURKE:  Would you ask the question
5  again, and I'll think about it?
6  BY MR. PEDERSON:
7      Q.  Did you seek out an attorney-client
8  relationship with Mr. Burke in connection with a
9  possible claim against IC System, the claim
10 asserted in this lawsuit?
11     A.  Yes.
12     Q.  Okay.  And did you approach Mr. Burke,
13 or did he approach you?
14     A.  I approached him.
15     MR. PEDERSON:  Okay.  Subject to
16 recross following your redirect, I do not have
17 further questions at this point concerning the
18 merits of the case, however, it is defendant's
19 position that class discovery has been stayed,
20 and should the case proceed beyond briefing on
21 the motions for summary judgment, then defendant
22 reserves the right to resume the deposition of
23 Mr. Frausto with respect to the class
24 certification issues.

Page 39

1      MR. BURKE:  And I object to that.  I
2  think that we should just do this in one shot,
3  but I understand defense counsel has a different
4  understanding of what the Court has ordered.
5      EXAMINATION
6  BY MR. BURKE:
7      Q.  Diego, a couple of questions.  I want
8  to clarify a couple of things.
9      Do you or do you not remember if you
10 gave your cell phone number to PayPal?
11     A.  I'm not entirely sure I gave my cell
12 phone number.
13     Q.  So it would be accurate to say that you
14 do not remember?
15     A.  Correct.
16     Q.  And you testified in your deposition
17 about who could contact you using an autodialer,
18 PayPal or someone else, and at the time, you
19 were referencing a contract that Mr. Pederson
20 showed you in Exhibit 2.
21     Do you remember those questions?
22     A.  Yes.
23     Q.  Okay.  I think you testified that
24 Exhibit A to Exhibit 2, that you didn't remember

Page 40

1  whether that was the contract or not between you
2  and PayPal; is that right?
3      A.  That is correct.
4      Q.  Do you have an independent recollection
5  of whether the contract that you entered into
6  with PayPal mentioned autodialers at all?
7      A.  No.  I mean, I don't remember that.
8  That was a while ago.
9      Q.  Okay.  So when you testified earlier
10 today about who PayPal could call using its
11 dialers, why did you say that earlier today?
12     A.  If that were the -- that's what it says
13 here, right?
14     Q.  I'm asking you.
15     A.  I think I'm confused with the question.
16     Q.  Okay.  So is it accurate to say that
17 you don't remember what the contract between you
18 and PayPal said?
19     A.  Correct.
20     Q.  You also testified earlier about the
21 relationship between IC System and PayPal; do
22 you remember that?
23     A.  Yes.
24     Q.  How do you know about the relationship

10 (Pages 37 to 40)

Electronically signed by Brenda  Tannehill (001-135-783-7494)                                    dadd63c0-1d66-4184-aaba-e460bee3a9f7

Page 41

1  between IC System and PayPal?
2      A.  Well, I would imagine that if IC System
3  was trying to collect an alleged debt, then that
4  was their relationship.
5      Q.  Do you have any independent knowledge
6  as to the true relationship between IC System
7  and PayPal?
8      A.  No.
9      Q.  And finally, are you aware that this
10 lawsuit originally brought claims under two
11 federal laws?
12     A.  Yes.
13     Q.  Okay.  One of them the Fair Debt
14 Collection Practices Act and one the Telephone
15 Consumer Protection Act, right?
16     A.  Right.
17     Q.  The class claims in this case relate to
18 the TCPA, don't they?
19     A.  Which is the telephone one, correct,
20 yes.
21     Q.  Having to do with autodialed calls and
22 prerecorded messages?
23     A.  Correct.
24     Q.  And the FDCPA portion of the case, what

Page 42

1  did that have to do with?
2      A.  The TCPA?
3      Q.  The FDCPA portion.
4      A.  That is the one where they did not
5  identify the purpose of the call or who was
6  calling me.
7      Q.  And we settled that portion of the
8  case, didn't we?
9      A.  Correct.
10         MR. BURKE:  That's all I have.
11             FURTHER EXAMINATION
12 BY MR. PEDERSON:
13     Q.  Mr. Frausto, would anything refresh
14 your recollection as to whether you gave your
15 cell phone number to PayPal when you opened your
16 account or at any other time?
17     A.  I don't believe so, no.  I think
18 earlier, I had made an assumption that I did,
19 but I can't say for sure I inputted my phone
20 number.
21     Q.  You can't rule it out, though?
22     A.  I can't rule it out, but I can't say I
23 did give them my phone number.
24     Q.  Did PayPal send you a confirmation

Page 43

1  e-mail after you opened your PayPal account?
2      A.  I can't remember.  It's a possibility.
3      Q.  Would you in connection with your
4  responses to the defendant's discovery in this
5  case search your e-mail system and see if there
6  is a confirmation e-mail showing the opening of
7  your PayPal account?
8      A.  Yes.  I have, though, looked through my
9  e-mail with anything relating with eBay and
10 PayPal and IC System, and what I gave to Alex is
11 what I found, but I can search again.
12     Q.  Okay.
13         MR. PEDERSON:  Well, subject to our
14 reservation of the right to ask questions about
15 class certification, I do not have any further
16 questions right now.
17         MR. BURKE:  Nor do I.
18         We'll reserve signature.
19             (Whereupon, the proceedings
20             concluded at 2:42 p.m.)
21
22
23
24

Page 44

1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4  DIEGO FRAUSTO,          )
5      Plaintiff,          )
6      vs.                 )No. 10-cv-1363
7  IC SYSTEM, INC.,        )Judge Zagel
8      Defendant.          )
9      This is to certify that I have read the
10 transcript of my deposition taken in the
11 above-entitled cause by BRENDA S. TANNEHILL,
12 Certified Shorthand Reporter, on January 18,
13 2011, and that the foregoing transcript
14 accurately states the questions asked and the
15 answers given by me as they now appear.
16
17 _____
18     DIEGO IVAN FRAUSTO
19
   SUBSCRIBED  AND  SWORN  TO
20 before me this _____ , day
   of _ _____ 2011.
21
   _____
22     Notary Public
23
24

11 (Pages 41 to 44)

Electronically signed by Brenda  Tannehill (001-135-783-7494)                    dadd63c0-1d66-4184-aaba-e460bee3a9f7

Page 45

```
 1    STATE OF ILLINOIS     )
 2                          ) SS:
 3    COUNTY OF K A N E     )
 4        I, BRENDA S. TANNEHILL, a notary public
 5    within and for the County of Kane County and
 6    State of Illinois, do hereby certify that
 7    heretofore, to-wit, on January 18, 2011,
 8    personally appeared before me, at 222 North
 9    LaSalle Street, Suite 300, Chicago, Illinois,
10    DIEGO IVAN FRAUSTO, in a cause now pending and
11    undetermined in the United States District
12    Court, Northern District of Illinois, wherein
13    DIEGO FRAUSTO is the Plaintiff, and IC SYSTEM,
14    INC. is the Defendant.
15        I further certify that the said witness
16    was first duly sworn to testify the truth, the
17    whole truth and nothing but the truth in the
18    cause aforesaid; that the testimony then given
19    by said witness was reported stenographically by
20    me in the presence of the said witness, and
21    afterwards reduced to typewriting by
22    Computer-Aided Transcription, and the foregoing
23    is a true and correct transcript of the
24    testimony so given by said witness as aforesaid.
```

Page 47

```
 1        McCorkle Court Reporters, Inc.
          200 N. LaSalle Street  * Suite 300
 2        Chicago, Illinois 60601-1014
 3            CERTIFIED MAIL
 4    DATE: January 19, 2011
      MR. DIEGO IVAN FRAUSTO
 5    481 Diane Drive
      Buffalo Grove, IL 60089
 6
 7    IN RE:  Frausto v. IC System
      DATE OF DEPOSITION: 01/18/2011
 8
 9    Dear Mr. Frausto:

10    Your deposition in the above-entitled cause is
      now ready for reading and signing as required by
11    law.

12    Please call the Signature Department upon
      receipt of this letter to schedule an
13    appointment to come to the above address to read
      and sign your deposition.  You have 28 days from
14    the date of this correspondence in which to
15    appear  for reading and signing.
      If you fail to keep this appointment or to
16    notify us so that we may make arrangements for
      another appointment, your deposition will be
17    completed and forwarded to the attorneys and
18    will be "... used as fully as though signed."
          _____ Procedure outlined in Rule 207 (a) of
19            the Illinois Supreme Court Rules

20        _____ Procedure outlined in Rule 30 (e) of
              the Rules of Civil Procedure for the
21            U.S. District Courts

22    Sincerely,

23    Margaret Setina       Court Reporter:
      Signature Department       Brenda S. Tannehill
24    cc: All Counsel of Record
```

Page 46

```
 1        I further certify that the signature to
 2    the foregoing deposition was not waived by
 3    counsel for the respective parties.
 4        I further certify that the taking of this
 5    deposition was pursuant to Notice, and that
 6    there were present at the deposition the
 7    attorneys hereinbefore mentioned.
 8        I further certify that I am not counsel
 9    for nor in any way related to the parties to
10    this suit, nor am I in any way interested in the
11    outcome thereof.
12        IN TESTIMONY WHEREOF:  I have hereunto
13    set my hand and affixed my notarial seal this
14    19th day of January, 2011.
15                    ___
16
17        Brenda Tannehill
18            Brenda S. Tannehill
19        NOTARY PUBLIC, KANE COUNTY, ILLINOIS
20
21
22
23
24
```



Draft Copy

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Brenda  Tannehill (001-135-783-7494)                    dadd63c0-1d66-4184-aaba-e460bee3a9f7

# Exhibit E

**Alex Burke**

| | |
|---|---|
| **From:** | ppederson@hinshawlaw.com |
| **Sent:** | Friday, February 04, 2011 4:14 PM |
| **To:** | Alex Burke |
| **Cc:** | dschultz@hinshawlaw.com |
| **Subject:** | Re: Frausto prerecorded messages |

IC left a message for Frausto when it made the following calls:

8-18-09 at 17.50 224-595-7867
8-19-09 at 12.16 224-595-7867
8-22-09 at 13.54 224-595-7867

(Times are in 24 hour format.)

The message left on these calls stated that, "Please contact I.C. System in regard to an important business matter at 1-888-241-8960. We are a debt collector attempting to collect a debt. Any information obtained will be used for that purpose. Again, please contact us at 1-888-241-8960."

IC did not leave any other messages for Frausto.

Peter E. Pederson
Hinshaw & Culbertson LLP
222 N. LaSalle St., Ste. 300
Chicago, IL 60601
Direct: 312-704-3604
Fax: 312-704-3001
ppederson@hinshawlaw.com

"Alex Burke" <ABurke@BurkeLawLLC.com>

02/02/2011 10:23 AM

To <ppederson@hinshawlaw.com>
cc
Subject Frausto prerecorded messages

Pete,

You and I spoke months ago about modifying the call log produced by ICS to include whether a message, prerecorded or otherwise, was left for plaintiff in each call.

I still don't have this information. My suspicion is that recorded messages were left in each call, but I need this information for my summary judgment motion. Can you please provide this information?

Alex Burke

1

# Burke Law Offices, LLC

155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

The information transmitted through this communication is intended only for the addressee and may contain confidential and/or privileged material. Any unauthorized interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by persons or entities other than the intended recipient is prohibited and may subject the unauthorized person or entity to criminal or civil liability. If you received this communication in error, please contact us immediately at (312) 729-5288, and delete the communication from any computer or network system.  This message is not intended to create an attorney-client relationship.  Unless you have entered into a written, signed document entitled "Authorization" with Burke Law Offices, LLC, the firm does not represent you.

Hinshaw & Culbertson LLP is an Illinois registered limited liability partnership that has elected to be governed by the Illinois Uniform Partnership Act (1997).

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.

# Exhibit F

Exhibit F consists of recordings plaintiff received from ICS.

Please see included compact disc for Exhibit F

# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DIEGO FRAUSTO, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 10-cv-1363 |
| | ) | |
| IC SYSTEM, INC., | ) | Judge Zagel |
| Defendant. | ) | |

### ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S
### SECOND AMENDED COMPLAINT

Defendant, I.C. SYSTEM, INC. ("IC"), submits the following as its Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint. IC states that at the hearing on September 30, 2010, the Court entered and continued the plaintiff's motion for leave to file the Second Amended Complaint pending the Court's ruling on the anticipated cross-motions for summary judgment. However, the minute order entered on October 5, 2010 (Docket # 17) stated that the motion for leave to file was granted. IC believes that the minute order was entered in error and that the Second Amended Complaint has not been properly filed and it is not the operative pleading. IC is filing this answer out of an abundance of caution and without waiving the foregoing position. IC was unable to obtain a transcript of September 30, 2010 hearing by the deadline to answer to the Second Amended Complaint because the court reporter was out of the office.

1. Plaintiff Diego Frausto ("plaintiff"), brings this action to secure redress for unlawful debt collection practice engaged in by defendant Credit Collection Services in violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 et seq. ("FDCPA") and the Telephone Consumer Protection Act, 47 U.S.C. §227 and implementing regulations and orders.

**ANSWER:** **IC denies the allegations of paragraph 1 of Plaintiff's Second Amended Complaint.**

2. Defendant IC System, Inc. ("ICS") called plaintiff and left a prerecorded voice message that violated the FDCPA because the message did not identify ICS. Further, ICS violated the TCPA because it impermissibly called plaintiff and a class of similarly situated

persons on their cell phones using proscribed automatic telephone dialing system and prerecorded voice equipment.

**ANSWER:   IC denies the allegations of paragraph 2 of Plaintiff's Second Amended Complaint.**

## JURISDICTION

3.     This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), and 15 U.S.C. §1692k (FDCPA).

**ANSWER:   IC admits the allegations of paragraph 3 of Plaintiff's Second Amended Complaint.**

4.     Venue is appropriate because a substantial portion of the events that gave rise to this cause of action occurred here. Defendant's debt collection attempts were directed at plaintiff, who lives in the Chicago area.

**ANSWER:   IC admits on information and belief that plaintiff resides in the Northern District of Illinois.  IC denies all remaining allegations in paragraph 4 of Plaintiff's Second Amended Complaint.**

## PARTIES

5.     Plaintiff is an individual who resides in this District.

**ANSWER:   IC admits on information and belief the allegations of paragraph 5 of Plaintiff's Second Amended Complaint.**

6.     ICS is a debt collection agency has its headquarters in the Saint Paul, Minnesota area.  ICS uses automatic telephone dialing systems and prerecorded messages to assist it in the collection of debts.

**ANSWER:   IC admits that it is a debt collector with its headquarters in St. Paul, Minnesota.  IC admits that, in certain circumstances, it uses a telephone dialing system and prerecorded messages while attempting to collect debts.  IC denies all remaining allegations in paragraph 6 of Plaintiff's Second Amended Complaint.**

7.     IC System is engaged in the business of collection of accounts, bills and other indebtedness, for others.

130020594v1  0910619  71482

**ANSWER:**    IC admits that it collects or attempts to collect debts owed to others in certain circumstances.  IC denies all remaining allegations in paragraph 7 of Plaintiff's Second Amended Complaint.

## FACTS

8.    ICS called plaintiff on plaintiff's cell phone using an automatic telephone dialing system and prerecorded voice message, in attempts to collect a debt allegedly owed to PayPal. Defendant has admitted to at least 38 such calls; plaintiff believes there were more.

**ANSWER:**    IC admits that when it sought to collect a debt that the plaintiff owed to PayPal, it called the plaintiff at a telephone number that he had provided to PayPal.  IC admits that it made these calls using a telephone dialing system that meets the definition of "automatic telephone dialing system" ("ATDS") set forth in the FCC's Declaratory Ruling, No. FCC 07-232. IC admits that it called plaintiff using its telephone dialing system a total of 38 times. IC lacks information or knowledge sufficient to admit or deny whether the number it called is assigned to a cellular telephone. IC denies all remaining allegations in paragraph 8 of Plaintiff's Second Amended Complaint.

9.    Although it uses different types of dialers, ICS only used an "Avaya dialer" to call plaintiff.  The Avaya dialer equipment ICS used to call plaintiff for all calls but two is located in St. Paul, Minnesota.  The Avaya dialer is capable of dialing telephone numbers without human intervention.  ICS used its Avaya dialer to call plaintiff as part of a dialing campaign, whereby no human being dialed plaintiff's telephone number.

**ANSWER:**    IC admits that it used an "Avaya dialer" located in St. Paul, Minnesota, to call plaintiff. In further answering, IC admits that it made telephone calls in which plaintiff's number was not manually dialed by a human being.  IC denies all remaining allegations in paragraph 9 of Plaintiff's Second Amended Complaint.

10.    Upon information and belief, once a batch of debt and debtor information (including debtor telephone numbers) is loaded into the Avaya dialer, the "intelligent" dialer selects what numbers to call, and when to do so, and then dials them.  It is not ICS' practice to obtain oral consent from debtors to receive prerecorded messages before leaving such a message.

3

**ANSWER:** IC denies the allegations in paragraph 10 of Plaintiff's Second Amended Complaint because IC's managers design dialing campaigns and decide the numbers that are called in IC's various dialing campaigns.

## COUNT I – FDCPA – INDIVIDUAL

11.    Plaintiff incorporates all previous paragraphs.

**ANSWER:** IC restates its answers to paragraphs 1 through 10 of Plaintiff's Second Amended Complaint.

12.    15 U.S.C. §1692d(6) requires that a debt collector making a telephone call provide meaningful disclosure of the caller's identity.

**ANSWER:** IC admits that this paragraph purports to paraphrase the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692d(6).  IC denies that it violated any provision of the FDCPA.

13.    The automated voice mail message that defendant left for plaintiff did not make a meaningful disclosure of the caller's identity.

**ANSWER:** IC denies the allegations of paragraph 13 of Plaintiff's Second Amended Complaint.

## COUNT II – TCPA PRERECORDED MESSAGE – CLASS

14.    Plaintiff incorporates all previous paragraphs.

**ANSWER:** IC restates its answers to paragraphs 1 through 13 of Plaintiff's Second Amended Complaint.

15.    The TCPA, 47 U.S.C. §227(b), prohibits calling persons on their cell phone using an automatic telephone dialing system, and prohibits calling persons on their cell phone using a prerecorded message.

**ANSWER:** IC denies the allegations of paragraph 15 of Plaintiff's Second Amended Complaint.

16.    Plaintiff brings Count II on behalf of a class pursuant to Rule 23(b)(2) and 23(b)(3).  The class is defined as:

> All persons with Illinois cell phone numbers (a) who ICS called using its Minnesota-based Avaya dialer; (b) where ICS used a pre-recorded voice; (c) in an attempt to collect an alleged PayPal debt; (e) [sic] where the PayPal contract was identical to that of plaintiff; and (e) any such call was made by ICS at any time between August 1, 2009 and August 30, 2009. Excluded from the class are persons who, according to ICS' records, did *not* provide the phone number called to ICS or to PayPal, and did not otherwise attempt to revoke consent to receive such calls.

**ANSWER:**   IC admits that Plaintiff seeks to bring his TCPA claim on behalf of the class defined in paragraph 16 of Plaintiff's Second Amended Complaint. IC denies that the TCPA claim can be certified as a class action. IC denies all remaining allegations of paragraph 16 of Plaintiff's Second Amended Complaint.

17.   Upon information and belief, there are more than 50 members of the proposed class; sufficient to satisfy the numerosity requirement.

**ANSWER:**   IC denies that the TCPA claim can be certified as a class action. IC denies all remaining allegations of paragraph 17 of Plaintiff's Second Amended Complaint.

18.   Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting any individual member of the class, including plaintiff. Such questions common to the Class include, but are not limited to:

   a.  Whether defendant used an automatic telephone dialing system and/or an artifical or pre-recorded voice within the meaning of the TCAP with respect to telephone calls to class members' cellular phones;

   b.  Whether such practices violate the TCPA; and

   c.  Damages

**ANSWER:**   IC denies that the TCPA claim can be certified as a class action. IC denies all remaining allegations of paragraph 18 of Plaintiff's Second Amended Complaint, including subparts (a), (b), and (c).

19.   Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has no interests that might conflict with the interests of the class. Plaintiff is interested in pursuing his claims vigorously, and has retained counsel competent and experienced in class and complex litigation.

130020594v1 0910619 71482

**ANSWER:** **IC denies that the TCPA claim can be certified as a class action. IC denies all remaining allegations of paragraph 19 of Plaintiff's Second Amended Complaint.**

20. Class action treatment is superior to the alternatives to the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

**ANSWER:** **IC denies that the TCPA claim can be certified as a class action. IC denies all remaining allegations of paragraph 20 of Plaintiff's Second Amended Complaint.**

21. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

**ANSWER:** **IC denies that the TCPA claim can be certified as a class action. IC denies all remaining allegations of paragraph 21 of Plaintiff's Second Amended Complaint.**

22. Defendant has acted on grounds generally applicable to the class, thereby making relief appropriate with respect to the class as a whole. Prosecution of separate actions by individual members of the class, should they realize their rights have been violated, would likely create the risk of inconsistent or varying adjudication with respect to individual members of the class that would establish incompatible standards of conduct.

**ANSWER:** **IC denies that the TCPA claim can be certified as a class action. IC denies all remaining allegations of paragraph 22 of Plaintiff's Second Amended Complaint.**

23. The identity of the class is likely readily identifiable from defendants' records, or through other administrative means.

**ANSWER:** **IC denies that the TCPA claim can be certified as a class action. IC denies all remaining allegations of paragraph 23 of Plaintiff's Second Amended Complaint.**

24. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

**ANSWER:** **IC denies that the TCPA claim can be certified as a class action. IC denies all remaining allegations of paragraph 24 of Plaintiff's Second Amended Complaint.**

130020594v1 0910619 71482

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

1. If IC violated the FDCPA, which IC denies, the violation was unintentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error.

2. IC's telephone dialing system is programmed to only leave messages that disclose IC's identity.  IC does not leave any messages that fail to disclose its identity.

3. If plaintiff's answering machine or voicemail recorded a message from IC that did not disclose IC's identity, plaintiff's cell phone, cell phone network, or answering machine failed to record the portion of the message which disclosed IC's identity.

4. IC's practice of only leaving messages that disclose its identity constitutes a procedure reasonably adapted to avoid the FDCPA violation that plaintiff has alleged.

### SECOND AFFIRMATIVE DEFENSE

1. Plaintiff's Second Amended Complaint fails to state a claim upon which relief may be granted.

### THIRD AFFIRMATIVE DEFENSE

1. A call made to a cell phone using an automatic telephone dialing system or prerecorded message ("an auto-dialed call") violates the Telephone Consumer Protection Act ("TCPA") only if it is made without the called party's consent. 47 U.S.C. § 227(b)(1). When a person gives his cell phone number to a creditor in connection with a debt, he gives consent for a debt collector seeking payment of the debt to make auto-dialed calls to that number. Federal Communications Commission Declaratory Ruling, FCC 07-232, ¶ 9.

2. Plaintiff gave his creditor the phone number that IC called when it tried to collect his debt. Thus, IC's calls to plaintiff could  not have violated the TCPA.

130020594v1  0910619  71482

3. In addition, in plaintiff's agreement with the creditor, plaintiff expressly consented to receiving auto-dialed calls at the phone number he provided.

4. Because IC's calls did not violate the TCPA, plaintiff has not stated a claim for relief under the TCPA, and he lacks constitutional standing to bring such a claim.

## FOURTH AFFIRMATIVE DEFENSE

1. The TCPA allows a person to recover actual damages resulting from a violation of the statute or to receive $500.00 per violation, whichever is greater. The TCPA provides for the trebling damages if the violation was willful.

2. If for the sake of argument a TCPA class were certified and the class contained several thousand people, liability to the class could potentially be so great as to result in defendant's insolvency.

3. The due process clause of the Fifth Amendment to the U.S. Constitution prohibits an award of damages that would result in iQor's insolvency, especially where, as here, the conduct that allegedly violated the TCPA did not cause actual injury or damages to the plaintiff or class members.

## FIFTH AFFIRMATIVE DEFENSE

1. In the event that the portion of the FCC Declaratory Ruling No. 07-232 which brings predictive dialers within the TCPA's definition of an "automatic telephone dialing system" is invalidated or withdrawn, IC will argue that its phone system does not amount to an ATDS under the statutory language set forth in 27 U.S.C. § 227(a)(1).

## SIXTH AFFIRMATIVE DEFENSE

1. Plaintiff's claims are barred by the statute of limitations.

## SEVENTH AFFIRMATIVE DEFENSE

1. Plaintiff's claims are moot.

130020594v1 0910619 71482

## EIGHTH AFFIRMATIVE DEFENSE

1.      Plaintiff's claims are barred based on the doctrine of waiver.

## NINTH AFFIRMATIVE DEFENSE

1.      Plaintiff's claims are barred based on the doctrine of estoppel.

## TENTH AFFIRMATIVE DEFENSE

1.      Plaintiff lacks constitutional standing to assert a TCPA claim because she consented to be contacted at the number she contends is assigned to her cell phone.

WHEREFORE, Defendant, I.C. SYSTEM, INC., respectfully requests that this Court deny the relief sought in Plaintiff's Second Amended Complaint, enter judgment in Defendant's favor and against plaintiff, and award Defendant its costs.


David M. Schultz                                    Defendant IC SYSTEM, INC.
Peter E. Pederson
Avanti D. Bakane                                    By:  /s/ Avanti D. Bakane
HINSHAW & CULBERTSON LLP                                  One of its Attorneys
222 N. LaSalle Street, Suite 300
Chicago, Illinois  60601
(312) 704-3000
Fax: (312) 704-3001
dschultz@hinshawlaw.com
ppederson@hinshawlaw.com
abakane@hinshawlaw.com

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on October 25, 2010, I served this document by filing it with the Court's CM/ECF system, which will make copies of the documents available to the following counsel of record.


Alexander H. Burke, Esq.
ABurke@BurkeLawLLC.com
BURKE LAW OFFICES, LLC
155 N. Michigan Avenue, Suite 9020
Chicago, Illinois  60601

/s/ Avanti D. Bakane

130020594v1  0910619  71482

# Exhibit H



# Search Licensees (to find and verify a person or entity is licensed)

**State** Minnesota
**Board** Debt
**Inquiry Date** 03/31/2011 09:35 AM

## IC SYSTEM INC

| | |
|---|---|
| **Business Location Address** | 444 E HWY 96 |
| | P O BOX 64444 |
| | ST PAUL, Minnesota 551640444 |
| **Business Phone Number** | 651-483-8201 |
| **Fax Phone Number** | |

## Licenses

| Collection Agency | | | | |
|---|---|---|---|---|
| **License Number** | **Original Issue Date** | **Status** | **Effective Date** | **Expiration Date** |
| 8000009 | 10-15-1941 | Active | 07-12-1989 | 06-30-2011 |

## Aliases

| Former Name | | | |
|---|---|---|---|
| **Name:** | **Effective Date** | **End Date** | **License Type** |
| CREDIT PROTECTIVE SVC OF IC SYS INC | 02-17-2007 | | |

## ⊕ Individual Associations

Displaying records 1 through 50 of 214

Next    50

| Full Name | License Number | License Type |
|---|---|---|
| ACOSTA , BEATRIS | 40159634 | Debt Collector |
| ALLISON , NYENATI | 20175115 | Debt Collector |
| ALWIN , ANGELA | 20498769 | Debt Collector |
| ANDAZOLA , RICHARD | 40238503 | Debt Collector |
| ANDERSON , CINDY | 40106480 | Debt Collector |
| ANDERSON , ERIC | 20104389 | Debt Collector |
| AREVALO , JOSE | 40194191 | Debt Collector |
| ARRIETA , DULCE | 20601955 | Debt Collector |
| arsenal , natasha | 40168102 | Debt Collector |
| BACON , RYAN | 20442156 | Debt Collector |

| | | |
|---|---|---|
| BAKER , KRISTY | 40095806 | Debt Collector |
| BARRON , ELIZABETH | 40118320 | Debt Collector |
| BECKSTROM EHLERS , MICHELLE | 3000591 | Debt Collector |
| BERGLUND , JOEL | 40118339 | Debt Collector |
| BERKEN , DAVID | 20475363 | Debt Collector |
| BJORKLUND , KATHRYN | 40194231 | Debt Collector |
| BLUHM , DEBRA | 20180046 | Debt Collector |
| BORNER , AMANDA | 40085519 | Debt Collector |
| BRANTLEY , DENISE | 20479083 | Debt Collector |
| BRAYLOCK , ERIC | 20042780 | Debt Collector |
| BREHEIM , BRIAN | 40065606 | Debt Collector |
| BREIMHORST , DANE | 20604802 | Debt Collector |
| BROWN , KELLY | 20584529 | Debt Collector |
| BROWN , TINA | 20623624 | Debt Collector |
| BUNKER , DENISE | 40095714 | Debt Collector |
| BUNKOWSKE , PATRICIA | 20068870 | Debt Collector |
| BYE , CHRISTINA | 40159695 | Debt Collector |
| BZDOK , ROXANNE | 20307855 | Debt Collector |
| CAMPBELL , VANCE | 20620559 | Debt Collector |
| CANTY , ANDRIA | 40096651 | Debt Collector |
| CARPENTER , AMANDA | 20224558 | Debt Collector |
| CARROLL , HEIDI | 20454072 | Debt Collector |
| CARROLL , LAURA | 20624334 | Debt Collector |
| CHIRIAC , SILVIU | 40106509 | Debt Collector |
| CLANCY , TERRY | 40106507 | Debt Collector |
| CLASEMAN , MARY | 20260289 | Debt Collector |
| CLAY , CHEVIE | 40238479 | Debt Collector |
| CLAY , DONALD | 20522768 | Debt Collector |
| CLEVELAND , JEREMY | 20160121 | Debt Collector |
| CONNETT , CHRISTINE | 40183481 | Debt Collector |
| COWAN , PIERRE | 40128637 | Debt Collector |
| CRAWFORD , KERISSA | 20375045 | Debt Collector |
| CURTIS , PATRICIA | 40056142 | Debt Collector |
| DALLUHN , MICHELLE | 20442190 | Debt Collector |
| DANIELSON , THOMAS | 20009107 | Debt Collector |
| DAVIS , TIFFANY | 20493311 | Debt Collector |
| DETERMAN , CHAD | 20361071 | Debt Collector |
| DIERENEY , TERESA | 40128538 | Debt Collector |
| DIGRE , KENT | 20564606 | Debt Collector |
| DIXON , DEVARYOUS | 40230473 | Debt Collector |

Do not use your browser's back button or all your data will be lost.
You must disable your pop-up blocker to view reports, for instructions Click Here
For System related questions, Click Here
For State Licensing related questions, Click Here

Copyright © 2005 Pearson Education, Inc. or its affiliate(s). All rights reserved.